# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* T.J. NOVAK, | ) ) | |
| Plaintiffs-Relator, | ) | |
| v. | ) ) | Case No. 18 C 5452 |
| WALGREENS BOOTS ALLIANCE, INC., | ) ) ) | Judge Joan H. Lefkow |
| Defendant. | ) ) | |

**DECLARATION OF DAVID A. JONES IN SUPPORT OF STATE OF CALIFORNIA'S OPPOSITION TO PLAINTIFF-RELATOR'S MOTION FOR A DECLARATORY JUDGMENT THAT RELATOR IS ENTITLED TO A SHARE OF THE STATE OF CALIFORNIA'S OPIOID ABATEMENT SETTLEMENT**

I, David A. Jones, declare as follows:

1. I am an attorney admitted to practice before the courts of the State of California and admitted *pro hac vice* before this Court. I am employed by the California Attorney General's Office as a Supervising Deputy Attorney General in the Healthcare Rights & Access Section. I was a lead negotiator for the State of California during the settlement negotiations that culminated in the multistate opioid settlement with Walgreen Co. ("Walgreens"). I am competent to testify to the matters set forth in the declaration and would do so if called upon by this Court.

2. The multistate settlement with Walgreens is dated as of December 9, 2022, with technical amendments that followed (the "Master Settlement Agreement"). As described more fully below, the Master Settlement Agreement with Walgreens was not a disguised Medicaid fraud settlement. The relator's suit had no bearing on California's investigation of—or eventual settlement with—Walgreens.

3. As discussed in greater detail below, neither California statute nor the state-court Stipulated Judgment, which settled and released many of the State of California's opioid-related claims against Walgreens, permits the use of settlement funds for Medi-Cal recovery or allocates any funds as damages to Medi-Cal.

4. Also as discussed in greater detail below, the vast majority of settlement funds go to subdivisions in California, with nearly all of the State of California's[1] share required to be spent on future "Opioid Remediation" designed to abate the opioid public health crisis and save lives. Indeed, the only non-Opioid Remediation use permitted by the State is small– approximately three quarters of one percent of California's potential recovery is for the Office of the Attorney General's representation in the matter, which otherwise did not receive fees for client representation, as well as the future enforcement of consumer protection laws.

---

[1] For purposes of clarity, use of the term "California" herein refers to the geographic territory of California and the state and its local governments therein. The term "State" or "State of California" refers to the state of California as a governmental unit.

1

5. On information and belief, in early 2016, a large group of state Attorneys General, including the Office of the California Attorney General, formed the multistate Opioid Working Group to address the opioid crisis, and by 2017, had begun investigating various entities related to their involvement in the opioid crisis, and thereafter negotiated a series of multi-billion-dollar, multistate settlements with a number of companies that contributed to the opioid crisis. These included the 2022 settlement with drug distributors AmerisourceBergen (now Cencora), Cardinal Health, and McKesson and drug manufacturer Johnson & Johnson / Janssen Pharmaceuticals. These opioid settlements, including the Walgreens Master Settlement Agreement, are among the most complex state attorney general settlements since the 1998 Tobacco Master Settlement Agreement.

6. The nature of Walgreens misconduct was well-known and widely publicized before the filing of relator's action. For example, Delaware's Attorney General filed a public nuisance lawsuit against Walgreens on January 19, 2018, six months before relator's suit was filed. A true and correct copy of that complaint is available electronically at https://news.delaware.gov/files/2018/01/2018.01.19_Final-Opioid-Complaint.pdf.

7. Similarly, Kentucky's Attorney General filed a public nuisance complaint against Walgreens on June 14, 2018, two months before relator's suit was filed. A true and correct copy of that complaint is available electronically at https://governor.ky.gov/attachments/20180614_WalgreensComplaint.pdf.

8. Notably, both complaints featured allegations similar to relator's later suit, including pharmacists' failures to properly determine the validity of controlled substance prescriptions, a failure of pharmacists' so-called "corresponding responsibility" under state law. (See Delaware Complaint, ¶¶ 86-91; Kentucky Complaint, ¶¶ 53-64). Both complaints were well-covered by major metropolitan or national media at the time of its filing.[2]

---

[2] See, e.g., *Delaware Sues Pharmaceutical Companies, Drug Store Chains Over Opioid Crisis*, January 19, 2018, NBC10, available at https://www.nbcphiladelphia.com/news/local/delaware-sues-pharmaceutical-companies-drug-store-chains-over-opioid-crisis/186589/; Vanessa Roma, *Kentucky Sues Walgreens for 'Dual Role' in the State's Opioid Crisis*, NPR, June 14, 2018, available at

9. In September 2021, a multistate negotiating team that included the Office of the California Attorney General had a conference call with Walgreens to lay the framework for settlement negotiations. Settlement talks would continue for over a year. These settlement negotiations did not benefit from, nor were they influenced by, relator's suit or disclosures.

10. The Master Settlement Agreement was reached in December 2022. The Relator did not contribute in any way to the Office of the California Attorney General's investigation of Walgreens, its settlement negotiations with Walgreens, nor its entry on behalf of the People of the State of California into this settlement with Walgreens.

11. Under the terms of the Master Settlement Agreement, settling states that opted to participate in the settlement did so via "Consent Judgments," typically filed in state court.

12. These state Consent Judgments may or may not include state-specific intrastate allocation agreements, which control the allocation of funds between a state (as a political entity) and its participating subdivisions, which may include cities, counties, and so-called special districts, such as hospital districts or school districts.

13. The People of the State of California's stipulated judgment was filed concurrently with its complaint on December 18, 2023, in *People of the State of California v. Walgreen Co.*, 23-CV-013529 (Sacramento Superior Court). A true and correct copy of the complaint is attached hereto as Exhibit A (the "Complaint").

14. The People of the State of California's Complaint brought two causes of action. The first was for violations of California Business and Professions Code section 17200 et seq—the Unfair Competition Law—California's principal consumer-protection statute. (Complaint, ¶¶ 29-39). The second cause of action was for abatement of a public nuisance pursuant to California Code of Civil Procedure section 3494. (Complaint, ¶¶ 29-39.) The suit neither alleged, nor sought relief for, any harms to the Medi-Cal program.

---

https://www.npr.org/2018/06/14/620154365/kentucky-sues-walgreens-for-dual-role-in-the-states-opioid-crisis.

15. The Master Settlement Agreement was entered in California as Exhibit A to the Stipulated Judgment in *People v. Walgreen Co.*, 23-CV-013529 (Sacramento Superior Court, January 4, 2024) ("Stipulated Judgment").

16. The Stipulated Judgment, including exhibits, is 865 pages long. A true and correct copy of the Stipulated Judgment is attached hereto as Exhibit B.

17. The Stipulated Judgment commands that the Master Settlement Agreement's terms "are incorporated by reference as if fully set forth herein," (Stipulated Judgment, ¶ 4), and "[i]n the event of a conflict between the terms of the [National Settlement Agreement] (including its exhibits and language in this Stipulated Judgment, the terms of the Agreement shall govern." (Stipulated Judgment, ¶ 7) (parenthetical in original).

18. The Stipulated Judgment also attaches as Exhibit B the California State-Subdivision Agreement Regarding Distribution and Use of Settlement Funds – Walgreens Settlement ("State-Subdivision Agreement"). The State-Subdivision Agreement is incorporated into the Stipulated Judgment pursuant to Paragraph 12 of the Stipulated Judgment and is permitted by Exhibit O of the Master Settlement Agreement.

19. The Stipulated Judgment through its incorporation of both the Master Settlement Agreement and the State-Subdivision Agreement control how much California receives from the settlement; how much flows to the State versus California's participating subdivisions; and how those funds can be used.

20. Nationwide, as in California, the settlement's monetary provisions fall into three buckets: (1) "Annual Remediation Payments," which comprise most of the settlement funds and are paid in 15 payments between 2022 and 2036; (2) private attorneys' fees for subdivisions across the country, which the State of California does not receive; and (3) for those states like the State of California that did not employ outside counsel, an "Additional Remediation Amount."[3]

---

[3] The Master Settlement Agreement contains a "State AG Fees and Costs" component of $63,842,206. (Stipulated Judgment, Exh. A, § I.YYY). The State of California does not have access to these funds, as they were given in equal measures to states that employed outside counsel, which California did not, and to reimburse the National Association of Attorneys General for a grant that funded hard costs associated

21. As discussed below, at the time of the settlement and continuing to this day, there exists uncertainty as to the amount participating states will receive from the Master Settlement Agreement.

22. Walgreens does not make payments directly to settling states or participating subdivisions. Rather, it makes payments into a trust, and a settlement administrator calculates and distributes payments due to each participating state and its subdivisions.

23. The largest portion of Walgreens's monetary payments are the "Annual Remediation Payments." These payments equal up to $4,788,165,456. (Stipulated Judgment, Exh. A, Exh. M).

24. California and its subdivisions are eligible to receive up to approximately 10.671% of the Annual Remediation Payments, or up to approximately $510,000,000 over the 15 years of payments. (Stipulated Judgment, Exh. A, Exh. F-2).

25. Beyond the uncertainty implicit in a payment stream lasting 15 years from a defendant with well-publicized financial difficulties in a highly competitive market facing increased consolidation,[4] the Master Settlement Agreement by design injects additional uncertainty.

26. Under the Stipulated Judgment, only 41% of California's potential Annual Remediation Payments were guaranteed as "Base Payments." The remaining 59% was reserved as "Incentive Payments," tied: (1) to the percentage by population of eligible cities and counties that participated in the settlement and agreed to release their claims ("Incentive BC"), and (2) whether non-participating subdivisions file future litigation against Walgreens or another released entity, and the lawsuit survives a so-called Threshold Motion ("Incentive D").

---

with many offices' opioid-related work. The Office of the California General did receive reimbursement for certain hard costs, including travel to mediations, from this grant.

[4] See, e.g., "Sycamore Partners Completes Acquisition of Walgreens Boots Alliance (August 28, 2025), available at https://www.walgreensbootsalliance.com/news-media/press-releases/2025/sycamore-partners-completes-acquisition-walgreens-boots-alliance.

27. While ultimately 100% of California's necessary eligible subdivisions participated in the settlement, and thus California obtained 100% of its potential Incentive BC funds, this was unknown at the time the settlement was negotiated.

28. Three percent of California's and its subdivisions' Annual Remediation Payments can still be lost should California fail to qualify for Incentive D. (Stipulated Judgment, Exh. A., § IV.H.6).

29. In addition, Walgreens payment obligations are at least temporarily reduced if its credit is downgraded below a threshold level by one or more of the national credit rating agencies. (Stipulated Judgment, Exh. A, § IV.K).

30. So, while the State of California and its subdivisions are still eligible to receive up to approximately $510,000,000 from this settlement, there is no guarantee that the State and its subdivisions will ever receive that amount, and the question of how much California will receive will not be answered until the final payment has been made.

31. While the Master Settlement Agreement as attached to the Stipulated Judgment controls the amount that California as a geographic entity receives, the State-Subdivision Agreement, attached as Exhibit B to the Stipulated Judgment, controls the allocation of Annual Remediation Payments among the State of California and its cities and counties that were eligible to participate in the settlement.

32. Under the State-Subdivision Agreement, which was negotiated by multiple state departments along with cities and counties, only 15% of the Annual Remediation Payments flow to the State of California. The remaining 85% of settlement funds goes to those eligible cities and counties in California that participated in the settlement. (Stipulated Judgment, Exh. B, § 4.).

33. Approximately 418 eligible cities and counties chose to participate in the settlement, and their allocations flow directly from the settlement administrator to those cities

and counties. In the most recent distribution, 84.785%. of Annual Remediation Payments went to participating cities and counties, not the State of California.[5]

34. Private attorneys' fees for subdivisions across the country, which equals 12.4% of the Base State Remediation Payment, with a maximum of $638,000,000, account for the next largest Walgreens payment under the Master Settlement Agreement. (Stipulated Judgment, Exh. A., § I.HHH). These funds are "for private attorneys litigation fees and costs on behalf of" subdivisions that participated in the settlement. (*Ibid.*) The State of California does not have access to these funds and has never received any of these funds.

35. The Master Settlement Agreement also includes an "Additional Remediation Amount," which represents up to two thirds of one percent of the Base State Remediation Payment, or approximately $31,921,103 (Stipulated Judgment, Exh. A, § I.A). The Additional Remediation Amount is for Participating States, including California, that did not employ outside counsel in their investigations or litigation against Walgreens. This is paid in six annual installments, beginning in 2023, and ending in 2028. (Stipulated Judgment, Exh. A, Exh. M).

36. California receives approximately 12.492% of the Additional Remediation Amount, or $3,987,689. (Stipulated Judgment, Exh. A, Exh. N). The Office of the Attorney General, which did not otherwise receive fees or other specialized funding for its representation, receives these funds. Pursuant to the Stipulated Judgment, they are only "used to reimburse the cost of opioid-related investigations and litigation and for the Attorney General's enforcement of consumer protection laws." (Stipulated Judgment, ¶ 12). No other uses are permitted under the judgment.

37. The Stipulated Judgment and Master Settlement Agreement provide no funds to state Medicaid coffers. Indeed, states, including California, negotiated a settlement that, while it

---

[5] If a city or county was eligible to participate in the settlement but did not, its allocation reverts to the State of California. (Stipulated Judgment, Exh. B., § 4.B.i(e).) There are currently 13 small cities that were eligible to participate in the settlement but did not. Their respective allocations returning to the State of California account for the State receiving 15.215% of the most recent Annual Remediation Payment, rather than 15%.

provides a broad release of most opioid-related state claims against Walgreens, is designed to tackle the opioid public health crisis and save lives, not reimburse state programs for any claims they may have had against Walgreens.

38. Under the settlement, 95% of all Settlement Fund (Annual Remediation) payments, are to be spent on Opioid Remediation. (Stipulated Judgment, Exh. A, § V.B.1).

39. The Settlement Agreement defines Opioid Remediation as "[c]are, treatment, and other programs and expenditures … designed to (1) address the misuse and abuse of opioid products, (2) treatment or mitigate opioid use or related disorders, or (3) mitigate other alleged effects of, including on those injured as a result of, the opioid epidemic." (Stipulated Judgment, Exh. A, § I.UU).

40. Exhibit E to the Master Settlement Agreement, which is incorporated by the Stipulated Judgment, provides exhaustive, albeit non-exclusive, examples of Opioid Remediation uses. None of these uses include reimbursement to state Medicaid coffers. (Stipulated Judgment, Exh. A, Exh. E). The list of permitted uses includes, but is not limited to: purchasing Naloxone or other Federal Drug Administration-approved opioid overdose reversal drugs; providing medication-assisted treatment and other opioid-related treatments; providing wrap-around services to individuals with Opioid Use Disorder, including housing, education, and job training; and preventing the misuse of opioids, including through media campaigns and public education. (Stipulated Judgment, Exh. A, Exh. E.)

41. While the 95% Opioid Remediation use requirement applies to the State and its subdivisions as a whole, the State of California's is not permitted to use its Annual Remediation payments for anything but "future Opioid Remediation." (Stipulated Judgment, Exh. B, §4.A).

42. To the extent that any Annual Remediation payments are spent on non-Opioid Remediation uses in California, it is participating subdivisions, not the State, that is permitted to make those non-Opioid Remediation expenditures.

43. By statute, all Annual Remediation payments received by the State go to the Opioid Settlements Fund. (Cal. Gov. Code § 12534, subd. (d)).

44. As such, no funds from the Walgreens settlement have flowed or will flow to Medi-Cal.

45. On information and belief, in California, much of the State's share has been spent to literally save lives, including through the purchasing and distribution of free, life-saving generic Naloxone and fentanyl test strips, not to provide recompense for relator's alleged fiscal injury to the Medi-Cal program.

46. The State cannot reimburse the Medi-Cal program for losses, assuming *arguendo* there were such loses, without modification of the Stipulated Judgment, the Master Settlement Agreement, and amendments to state statute.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on January 30, 2026, in Sacramento, California.

/s/ David A. Jones
DAVID A. JONES
Supervising Deputy Attorney General
California Department of Justice
Office of the Attorney General

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on January 30, 2026, she caused a true and correct copy of **DECLARATION OF DAVID A. JONES IN SUPPORT OF STATE OF CALIFORNIA'S OPPOSITION TO PLAINTIFF-RELATOR'S MOTION FOR A DECLARATORY JUDGMENT THAT RELATOR IS ENTITLED TO A SHARE OF THE STATE OF CALIFORNIA'S OPIOID ABATEMENT SETTLEMENT** to be served via the Court's ECF/electronic mailing system upon all counsel of record.

/s/ Jennifer S. Gregory