UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America, and the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington, *ex rel.* T.J. Novak, <br><br>　　　　　　　Plaintiffs-Relator, <br><br>　　　　　v. <br><br>Walgreens Boots Alliance, Inc., <br><br>　　　　　　　Defendant. | **Case No. 18 C 5452** <br><br> **Judge Joan H. Lefkow** |

### STATE OF MARYLAND'S OPPOSITION TO RELATOR'S MOTION FOR DECLARATORY JUDGMENT THAT RELATOR IS ENTITLED TO A SHARE OF THE STATES' SETTLEMENT WITH WALGREENS

This Court should either reject Relator T.J. Novak's motion for declaratory judgment on its merits or simply decline to adjudicate it. On the merits, relator's motion asks this Court to assume that his *qui tam* action, which sought damages on behalf of Maryland's Medicaid program, is virtually identical to a massive $4.8 billion national consumer protection settlement whose proceeds will almost entirely flow to Maryland localities to assist individual Marylanders in overcoming opioid addiction. The two cases could not be more dissimilar: different legal frameworks, different

investigations, different victims, different remedies. This incongruence, on its face, should provide the Court with ample evidence to reject relator's motion.

If the Court declines to reject relator's motion on its merits, there is still another way forward. The Court need not wade into the complex thicket of Maryland laws at issue nor peruse the voluminous, 824-page opioid settlement seeking answers. The Court can simply refuse supplemental jurisdiction over relator's motion, given that the state and federal government claims in this case have been dismissed and given that relator's arguments predominantly involve novel Maryland legal issues and Maryland statutes. Relator could simply file a motion in Maryland state court, which has proximity to the legislature that wrote the relevant laws and expertise with Maryland-specific legal questions. The alternative is for this Court to not only supplant the decision-making authority of Maryland courts over Maryland legal matters but to similarly intrude upon the jurisdiction and expertise of the 27 other states targeted by relator's motion. The Court should decline this invitation from relator by simply rejecting his motion or declining to adjudicate it.

I. **INTRODUCTION**

Relator's motion seeks to pry money out of a vast, complex and long-running effort by the State of Maryland to combat the scourge of opioid addiction that has ravaged its communities. That effort reached a milestone on December 9, 2022, when the State of Maryland joined a multi-state settlement agreement with 52 states and U.S. territories and Walgreens ("Opioid Settlement"). In total, Walgreens agreed to pay more than $4.8 billion. Of that amount, Maryland and 45 of its subdivisions will receive about $74.7 million disbursed over 15 years. To date, Maryland and its

subdivisions have received three payments from Walgreens totaling about $15.1 million.

Notably, these Opioid Settlement payments do *not* flow into Maryland Medicaid's coffers. Instead, the money is mostly going to Maryland subdivisions, or municipalities, to pay for opioid treatment, remediation and prevention. The remainder of the payments from Walgreens will be used by the State for opioid treatment, remediation and prevention. In other words, the money will be used to help the Maryland consumers harmed by the opioid epidemic to which Walgreens contributed. The Opioid Settlement thus has no connection to false claims submitted by Walgreens, Medicaid recovery, or protecting the public fisc, which were the basis for relator's underlying lawsuit in this matter. In fact, the investigation that gave rise to the Opioid Settlement was entirely separate and independent of the false claims investigation occasioned by relator's *qui tam* complaint. In no sense was the Opioid Settlement an alternative resolution of relator's claims.

## II. MARYLAND LAW PRECLUDES RELATOR'S REQUEST AND THE COURT SHOULD DENY IT OR LEAVE THE MATTER TO MARYLAND STATE COURTS

### A. Relator Lacks Alternative Share Rights Under Maryland Law.

On January 2, 2024, the Court dismissed, with prejudice, all Maryland claims. *See* Order ¶ 1, ECF No. 33. As to relator's motion, this fact is dispositive. Relator's underlying fraud action—and his request for declaratory judgment—relies upon the Maryland False Health Claims Act. *See* Relator's Motion for a Declaratory Judgment,

3

ECF No. 84 ¶ 2. That law's plain text, however, precludes his demand for an alternate remedy share given Maryland's dismissal. The law states:

> If the State seeks an alternative remedy in another proceeding *after intervening* in a civil action filed under this section, the person initiating the action shall have the same rights in the alternative proceeding as the person would have had if the civil action had continued under this section.

MD. CODE ANN, HEALTH-GENERAL § 2-604(c)(2) (emphasis added). The plain meaning here is clear: relator's right to an alternate remedy arises **if and only if** Maryland intervenes. Maryland is not an intervenor in this case; it has been dismissed. Relator therefore has *no* alternate remedy rights in this matter as to Maryland. The Court can reject relator's Motion for this reason alone.

### B. The Court Should Refuse Supplemental Jurisdiction Over Novel Controversies About Maryland Law.

While the preceding argument is straightforward, the Court could also simply avoid adjudicating the issue because it arises under Maryland law and is therefore the province of Maryland courts. *Maryland's false claims alternate remedy provision has never been litigated in Maryland courts.* It is thus a complex issue of first impression best left to the courts in the state in which the law originates.

Indeed, district courts may refuse supplemental jurisdiction over state law claims when those claims raise "novel or complex" issues of State law. 28 U.S.C. § 1367(c)(1). The Seventh Circuit has held likewise. *See Buethe v. Britt Airlines, Inc.*, 749 F.2d 1235 (7th Cir. 1984) (not advisable to exercise doctrine of pendent jurisdiction over state claim raising novel and unsettled questions of state law); *Willis*

4

*v. Bell*, 669 F. Supp. 229, 232 (N.D. Ill. 1987) (federal courts have declined to exercise jurisdiction over state-law claims posing novel or unsettled state-law issues).

This doctrine "should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *Khan v. State Oil Co.*, 93 F.3d 1358, 1366 (7th Cir. 1996); *see also Huffman v. Hains*, 865 F.2d 920, 923 (7th Cir. 1989) ("[R]espect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law, become paramount concerns.").

Here, relator's motion would require the Court to exercise supplemental jurisdiction given that the Court has already dismissed the underlying claims in this litigation. But the Court should decline to do so. To the extent that it is unclear, on the face of the Maryland statute quoted above, that relator's motion is futile, the Court should not impose its own interpretation of the statute. Not only have Maryland courts not opined on the alternate remedy provision, they have not issued any decisions at all interpreting *any* aspect of the Maryland False Health Claims Act. Relator's motion would thus require the Court to weigh in on a truly novel issue of Maryland law—an issue best handled by state courts proximate to the state legislature that drafted and passed the law in question. The Court should therefore refuse supplemental jurisdiction over relator's motion.

### C. The Court Should Refuse Supplemental Jurisdiction Over a Matter Dominated By Maryland Law.

Not only are novel Maryland legal questions at stake in relator's motion, but they are virtually the *only* legal questions at stake. This gives the Court yet another compelling reason to decline jurisdiction.

Section 1367(c) allows the Court to refuse supplemental jurisdiction where state law claims "substantially predominate." 28 U.S.C. § 1367(c)(2). The discussion above underscores that at least three Maryland statutes are at issue here: False Health Claims Act (MD. CODE ANN., HEALTH-GENERAL §2-601 *et seq.*), the Consumer Protection Act (MD. CODE ANN., COMMERCIAL LAW. § 13-101 *et seq.*), and the Opioid Restitution Act (MD. CODE ANN., STATE FIN. & PROC. § 7-331).

Another Illinois federal district court refused jurisdiction in a similar scenario because "[t]he only significant legal questions concerning these four Defendants are of state law, and the state courts are better suited than this Court to decide those questions, in part because they are better situated to accurately gauge the legislative intent behind the statutes in question and the policies guiding the common law issues involved." *Clemons v. City of Springfield*, 735 F. Supp. 309, 313 (C.D. Ill. 1990). Similarly, here, the Court should allow Maryland courts to interpret the Maryland laws at issue.

Additionally, under Section 1367(c), a district court may decline supplemental jurisdiction when all claims giving rise to original jurisdiction have been dismissed. 28 U.S.C. § 1367(c)(3). Although the decision is discretionary, "[w]hen all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law

6

claims." *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). All federal claims in the instant matter have been dismissed. Maryland law dominates the analysis required to adjudicate relator's motion. The Court therefore should consider refusing jurisdiction over relator's motion.

### III. MARYLAND'S OPIOID SETTLEMENT WAS NOT AN ALTERNATE RESOLUTION OF RELATOR'S LAWSUIT

The basic premise of relator's motion is *fundamentally* mistaken. Under the Maryland False Health Claims Act, people face liability and damages for submitting false claims to government health programs like Medicaid. MD. CODE ANN, HEALTH-GENERAL § 2-602(a). Whistleblowers, like relator, can file complaints on the state's behalf. *Id.* § 2-604(a). If the state, after intervening in the whistleblower's case, resolves the whistleblower's allegations in another forum or under a different legal rubric, then relator can seek a share of that alternate remedy. *Id.* § 2-604(a)(2) & (c)(2).

But what is critical in this analysis is that relator cannot seek an alternate remedy for a claim *he could not have brought in the first place.* As the D.C. Circuit explained: "[I]f the alternate proceeding seeks recompense for some other type of claim that the relator could not have brought, then the proceeding is not covered . . . because it is not 'alternate' to the False Claims Act *qui tam* remedy. It is a different legal claim altogether, arising beyond the False Claims Act's borders." *United States v. Novo A/S*, 5 F.4th 47, 56 (D.C. Cir. 2021). Thus, if the case is not dismissed in accordance with Maryland's False Health Claims Act because Maryland was not an intervener, the Court must examine the nature of the Opioid Settlement to determine

7

if it is substantially similar to relator's false claims action such that an alternate remedy might be available to him.

Close examination shows that the settlement is clearly outside the false claims act's borders. To begin, the settlement between Maryland and Walgreens stems from allegations that Walgreens violated the Consumer Protection Act in its representations to consumers about opioid dispensing. Maryland's Consumer Protection Act does not contain anything remotely like the false claims act's *qui tam* provision. MD. CODE ANN., COM. LAW §§13-408; 13-301. Thus, it is clear that relator could not have brought the consumer claims resolved in the Opioid Settlement as a relator.

To continue, the Opioid Settlement, subject to a Maryland court order, mandated that the settlement funds are spent on strategies to abate and remediate the effects of the opioid epidemic, with at least 95 percent of the funds going toward opioid remediation. Walgreens Settlement Agreement, Exhibit 1, § V.B.1 (page 29). What is critical to note is that none of the funds will flow back into Maryland's Medicaid program. Rather, the funds will mostly go to local governments and community organizations to provide services for people with opioid use disorder. Contrast this with relator's action, which sought to recover funds for the Maryland Medicaid program. Other than a focus on opioid prescribing, relator's *qui tam* lawsuit and the Opioid Settlement could not be more dissimilar in scope, legal framework, and remedy.

8

Indeed, the Opioid Settlement has a specificity and detail in its disbursement of funds that relator never contemplated in his lawsuit. Exhibit E of the agreement outlines a non-exhaustive list of the abatement strategies states and subdivisions can utilize with the settlement funds. The funds must go towards evidence-based or evidence-informed programs for Opioid Use Disorder ("OUD") and any other co-occurring substance use disorders or mental health conditions. Walgreens Settlement Agreement, Exhibit 1, § I.UU (page 7) (defining Opioid Remediation); *id.* at Section V.B.2, page 29 (highlighting that states and subdivisions must report to the Settlement Fund Administrator and Walgreens any amount of money of the Walgreens Settlement that is not spent on Opioid Remediation); *see also id.*, Exhibit E. Schedule A of Exhibit E outlines the "core abatement strategies" states can prioritize when implementing their programs. *Id.* These include:

1. Naloxone or other FDA-approved drugs to reverse opioid overdoses;
2. Medication-Assisted Treatment ("MAT") distribution and other opioid-related treatment;
3. Programs for pregnant and postpartum women who have Opioid Use Disorder ("OUD") and other substance use disorders;
4. Expanding treatment for Neonatal Abstinence Syndrome ("NAS");
5. Expansion of warm hand-off programs and recovery services;
6. Treatment for incarcerated populations with OUD;
7. Prevention programs;
8. Expanding syringe service programs; and
9. Funding evidence-based data collection and research analyzing the effectiveness of the abatement strategies within the State.

*Id.* at E-1 to E-3. A longer list of abatement strategies states can choose from is listed in Schedule B. *Id.* at E-4 to E-15. By contrast, relator's *qui tam* lawsuit simply sought return of fraudulent funds to Medicaid, with no earmarks or specificity about use.

Maryland statute, similarly, restricts the funds received from the Walgreens settlement to opioid remediation. State law requires that "all revenues received by the State from any source resulting, directly or indirectly, from any judgment against, or settlement with, opioid manufacturers, opioid research associations, or any other person in the opioid industry relating to any claims made or prosecuted by the State to recover damages for violations of State law" be placed in the Opioid Restitution Fund. MD. CODE ANN., STATE FIN. & PROC. § 7-331(e)(1). The Opioid Restitution Fund may *only* be used to provide funds for the purposes specified in those settlement agreements, including "programs, services, supports, and resources for evidence-based substance use disorder prevention, treatment, recovery, or harm reduction." MD. CODE ANN., STATE FIN. & PROC. § 7-331(f). Neither the settlement agreement nor Maryland law allows for the funds to be allocated to the state's Medicaid program.

In sum, a simple chart shows the considerable incongruence between relator's *qui tam* action and the Opioid Settlement:

|  | **RELATOR'S *QUI TAM*** | **OPIOID SETTLEMENT** |
|---|---|---|
| **Injured parties:** | Medicaid Program | Maryland consumers |
| **Statutory framework:** | False Health Claims Act | Consumer Protection Act |
| **Recipient of funds:** | Medicaid | Maryland opioid remediation |
| **Whistleblower provision:** | Yes | No |

Clearly, the Opioid Settlement is well outside the borders of the false claims act such that relator cannot receive an alternate remedy share from the proceeds of the settlement.

## IV. CALCULATING RELATOR'S SHARE IS PROBLEMATIC

10

In the event that the Court seeks to analyze the merits of relator's motion, it is important to point out that the alternate remedy funds available to relator are *far* more limited than he suggests. Relator can only obtain an alternate remedy share from funds given to the State of Maryland. *See* MD. CODE ANN, HEALTH-GENERAL § 2-604(c)(2). Such funds constitute a minority of the money that will flow from the Opioid Settlement—and disentangling these funds from the rest of the settlement may prove a herculean task for this Court requiring far more evidence and analysis than relator's simplistic motion suggests.

Relator acknowledges that some of the money that States have received has already been disbursed to Maryland subdivisions, complicating relator payments. *See* Relator's Motion for a Declaratory Judgment, ECF 84, at 8. However, relator argues that the future money States expect to receive "could easily be set aside to pay the relator share to which Mr. Novak is entitled." *Id.* Relator underestimates the complexities of the payment structure outlined in the settlement agreement.

Walgreens is not paying out its settlement to states and their subdivisions in one lump sum. Instead, the payments are separated into five different categories and are disbursed over the course of 15 years. The five categories are: (1) Base payments, (2) Incentive A payments, (3) Incentive BC payments, (4) Incentive D payments, and (5) Additional Remediation Amount ("ARA") payments. Base payments make up 41 percent of the annual payments that states are to receive and will be broken out in 15 payments over the course of 15 years. *See* Walgreens Settlement Agreement, Exhibit 1, § IV-G (page 20); *see also* Exhibit M-2. Then, each state may receive

11

incentive payments based on each state's rate of subdivision participation.[1] For states that qualify, Incentive A payments make up 59 percent of the annual payments and are issued over the course of 14 years beginning Payment Year 2. Walgreens Settlement Agreement, Exhibit 1, § IV-H(4) (page 21). For states that do not qualify for Incentive A, including Maryland, Incentive BC payments are a maximum of 56 percent of each state's allocation and are issued over the course of 14 years beginning Payment Year 2. Walgreens Settlement Agreement, Exhibit 1, § IV-H(5) (page 22-23); see also *id.* at Exhibit M-2. Incentive D payments are a maximum of 10 percent of each state's allocation and are issued over the course of 10 years beginning in Payment Year 6. Walgreens Settlement Agreement, Exhibit 1, § IV-H(6) (page 25);

---

[1] As set forth in Section IV-H(4) of the Settlement Agreement, "Incentive Payment A is mutually exclusive with Incentive Payments BC and D." Maryland did not qualify for Incentive A payments but remained eligible for Incentives BC and D, which are based on the actions of Maryland's subdivisions. The incentive structure for Incentives BC and D are set forth fully below.

"The amount of Incentive Payment BC for which a Settling State is eligible shall be determined based on the aggregate population of the Settling State's Incentive BC Subdivisions that are Participating Subdivisions or have had their claims resolved through a Case-Specific Resolution, divided by the aggregate population of all the Settling States's Incentive BC Subdivisions. The Settling State's Incentive BC Subdivisions are (i) all Litigating Subdivisions (including School Districts and Special Districts) and (ii) all Non-Litigating Threshold Subdivisions (collectively, all Litigating Subdivisions and all Non-Litigating Threshold Subdivisions are "*Incentive BC Subdivisions*"). Walgreens Settlement Agreement, Exhibit 1, § IV-H(5) (page 23).

"A Settling State is eligible for Incentive Payment D if no Later Litigating Subdivision (for purposes of Incentive Payment D, Later Litigating Subdivisions are limited to (i) a Primary Subdivision; (ii) a school district with a K-12 student enrollment of at least 25,000 or 0.10% of the State's population, whichever is greater; (iii) a health district or hospital district that has at least one hundred twenty-five (125) hospital beds in one or more hospitals rendering services in that district; and (iv) Primary Fire Districts) in that State has a lawsuit against a Released Entity survive more than six (6) months after denial in whole or in part of a Threshold Motion." Walgreens Settlement Agreement, Exhibit 1, § IV-H(6) (page 25).

*see also id*. at Exhibit M-2. Of the five categories of payments that are available from the settlement, Maryland qualifies for four: (1) Base payments, (2) Incentive BC, (3) Incentive D, and (4) ARA.

The Opioid Settlement not only encompasses an agreement between Maryland and Walgreens, but also agreements between Walgreens and Maryland's political subdivisions. The agreement between Maryland and Walgreens expressly contemplated that Maryland's political subdivisions sign on to the agreement, release their claims against Walgreens, and receive a portion of the settlement proceeds. Recognizing the "uniqueness of States and their Subdivisions," the settlement agreement allows, and encourages, individual states to "enter into State-Subdivision Agreements in order to direct the allocation of their portion of the Settlement Fund." Walgreens Settlement Agreement, Exhibit 1, § V-C (page 29). Maryland opted to create its own State-Subdivision Agreement that conformed with Maryland law[2] and that gave Maryland's subdivisions a majority of Maryland's opioid-related settlement proceeds. *See* 2022 State-Subdivision Agreement, Exhibit 2 and 2023 amended State-Subdivision Agreement, Exhibit 3.

The Walgreens Settlement Agreement defines "annual remediation payments" (hereinafter "annual payments") as the sum of the base payments and incentive payments. For Maryland specifically annual payments are the sum of the base payments and Incentive BC and D payments. § IV-B(1) (page 15). Pursuant to the

---

[2] Maryland law requires that appropriations from the Opioid Restitution Fund be made in accordance with its State-Subdivision Agreements. Md. Code Ann., State Fin. & Proc. § 7-331(h)(2)(i).

13

State-Subdivision Agreement, Maryland's subdivisions receive 70% of the annual payment. Forty-five percent of the annual payment goes to a "subfund of the Opioid Restitution Fund created for the purpose of holding and distributing payments" to the subdivisions to fund programs as permitted by the Settlement Agreement and Maryland statute. 2022 State-Subdivision Agreement, Exhibit 2, § IV(a)(2)(B) (page 7). The remaining 25% of the subdivisions' portion is given directly to the subdivisions by a third-party administrator. *Id.* § IV(a)(3) (page 8). The State, on the other hand, only receives 30% of the annual payment plus the total amount of the ARA. *Id.* § IV(a)(1), (2)(A) (pages 6-7). Half of the State's annual payment is set aside in a discretionary fund, and the State-Subdivision Agreement requires the State to establish a grant program for subdivisions as part of that discretionary fund. *See id.* § IV(a)(2)(A) (page 7). Accordingly, only 15% percent of the amount allocated to Maryland in the Walgreens settlement is set aside for the State.[3]

As described in Section I, relator is not entitled to any monies Maryland and its subdivisions received from the Walgreens settlement, and these settlement proceeds should be used for funding opioid remediation programs, as required by the Settlement Agreement and state law. However, should this Court decide differently and grant relator a declaratory judgment on his *qui tam* claims, relator would only be entitled to a limited subset of money. Relator concedes that he is only entitled to the future monies going towards the State. *See* Relator's Motion, ECF 84, ¶ 14. Of

---

[3] Out of the $74,763,582.54 Walgreens is set to pay Maryland, the State will receive $23,022,894.87. That amount is reduced further because an additional portion is placed in the discretionary fund for potential subdivision grants. The remaining $51,740,687.67 goes to the 45 subdivisions, either directly or through the Opioid Restitution Fund.

the future payments, relator would not be entitled to the 85 percent of Maryland's annual payments that are directly given to the subdivisions or set aside for grants. *See* 2022 State-Subdivision Settlement Agreement, Exhibit 2.

The bottom line here is that calculating relator's alternate remedy share—an inevitability should the Court grant relator's motion—would be complex and problematic to say the least. Rather than taking on this task, the Court is better served by declining to decide the issue at all.

## V. CONCLUSION

For the reasons articulated above, the Court should either (a) deny relator's motion, or (b) refuse jurisdiction over it and leave the matter to Maryland courts.

Dated: January 30, 2026

Respectfully submitted,

**ANTHONY G. BROWN**
Attorney General of Maryland

_____/s/_____
**RAJA S. MISHRA**
Assistant Attorney General
Medicaid Fraud and Vulnerable Victims Unit
200 St. Paul Place
Baltimore, Maryland 21202
(410) 576-6381
rmishra@oag.maryland.gov

**HALEY VAN EREM**
**MELANIE BABB**
Assistant Attorneys General
Consumer Protection Division
200 St. Paul Place
Baltimore, Maryland 21202

15

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 30, 2026, the foregoing STATE OF MARYLAND'S OPPOSITION TO RELATOR'S MOTION FOR DECLARATORY JUDGMENT THAT RELATOR IS ENTITLED TO A SHARE OF THE STATES' SETTLEMENT WITH WALGREENS was served upon all counsel of record via the Court's CM/ECF system.

_____/s/_____
Raja Mishra
Assistant Attorney General
*Counsel for the State of Maryland*