**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>STATE OF ILLINOIS, et al. *ex rel.*<br>T.J. NOVAK,<br><br>Plaintiffs-Relator,<br>v.<br><br>WALGREENS BOOTS ALLIANCE, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 18 C 5452<br>Judge Joan H. Lefkow |

**DECLARATION OF ANDREA LAW IN SUPPORT OF STATE OF ILLINOIS'S OPPOSITION TO PLAINTIFF-RELATOR'S MOTION FOR DECLARATORY JUDGMENT**

I, Andrea Law, hereby declare:

1. I am an Assistant Attorney General in the Office of the Illinois Attorney General. My title is Deputy Bureau Chief for the Health Care Bureau, and I work in both the Health Care and Consumer Fraud Bureaus in the office.

2. The Walgreens National Settlement Agreement is one of numerous national multistate opioid-related settlements that have been the result of longstanding work by state Attorneys General across the country to address the opioid crisis. These efforts date back to at least 2016 and, over the last decade, have included investigations, litigation, and negotiations involving various entities, including opioid manufacturers, distributors, and pharmacies, for their role in the crisis.

3. On information and belief, state Attorneys Generals' efforts initially began with investigations into Purdue Pharma and its owners. This work led to multistate investigations into several other opioid manufacturers, as well as large pharmaceutical distributors.

4. Throughout this time, thousands of lawsuits nationwide were being filed by local governments against numerous defendants for opioid-related claims. Many of these local government lawsuits were consolidated into a multi-district litigation case in the Northern District of Ohio. Numerous lawsuits were also filed by State Attorneys General.

5. The first nationwide settlements stemming from the above-described efforts were reached with pharmaceutical manufacturer Johnson & Johnson and the three largest pharmaceutical distributors in 2021. These settlements included complex settlement agreements and monetary distribution processes in order to resolve both state and local government claims.

6. This complex settlement structure involved a process by which states and relevant local governments signed onto the national settlements and agreed to broadly release possible civil claims relating to the settling defendants' conduct in the opioid market. This broad release and general settlement structure has been used in many of the subsequent national multistate settlements, including in the Walgreens settlement.

7. This complex settlement structure also set forth the ways in which states and local governments could divide and distribute settlement funds. As discussed in greater detail below, in Illinois, the State and local governments agreed upon a method to allocate and distribute opioid settlement funds in the Illinois Opioid Allocation Agreement.

8. The Illinois Opioid Allocation Agreement, effectuated in December 2021, is an intrastate allocation agreement that was negotiated between the Illinois Attorney General and the seven largest Illinois counties and has been joined by more than 180 Illinois subdivisions. The Illinois Opioid Allocation Agreement dictates how monies from all national multistate opioid settlements are to be distributed in Illinois.

9. Illinois' settlement with Walgreens was effectuated through a Final Consent Judgment and Dismissal with Prejudice entered by the Circuit Court of Cook County, Illinois, on December 7, 2023 ("Illinois State Court Judgment"). A true and correct copy of the Illinois State Court Judgment is available electronically at: ILLINOIS-Consent-Judgment-Walgreens.pdf.

10. The National Walgreens Settlement Agreement, dated December 9, 2022, is incorporated into the Illinois State Court Judgment (attached as Exhibit A thereto) and became effective by its terms upon entry of the Illinois State Court Judgment.

11. The Illinois Opioid Allocation Agreement is also incorporated into the Illinois State Court Judgment (attached as Exhibit B thereto). The Illinois State Court Judgment orders that the Illinois Opioid Allocation Agreement is the means by which funds paid to Illinois pursuant to the National Walgreens Settlement Agreement will be distributed within the State.

12. Like other national opioid settlements, the Walgreens Settlement Agreement requires that the vast majority of settlement funds must be used for opioid abatement. Specifically,

pursuant to Section V.B.1 of the Walgreens Settlement Agreement, not less than 95% of Walgreens' Annual Remediation Payments must be used for opioid remediation purposes, as defined, which can include reimbursement for past remediation programs or expenditures or to fund future remediation work. Pursuant to Section V.D.1 of the Settlement Agreement, not less than 70% must be used solely for future opioid remediation.

13. Consistent with this, the Illinois Opioid Allocation Agreement requires that the majority of monies allocated throughout the state be used for Approved Abatement Programs. The list of Approved Abatement Programs is attached as an exhibit to the Illinois Opioid Allocation Agreement and mirrors the approved uses set forth in the National Walgreens Settlement Agreement.

14. Pursuant to the Illinois Opioid Allocation Agreement, 55% of the Walgreens Annual Remediation Payments received by Illinois goes to the Illinois Remediation Fund. The Illinois Opioid Allocation Agreement sets forth that an Advisory Board consisting of both state and local representatives makes recommendations on the use of the monies in the Illinois Remediation Fund.

15. To implement the Illinois Opioid Allocation Agreement and further the administration and purpose of the Illinois Remediation Fund, Governor Pritzker established, via Executive Order, an Office of Opioid Settlement Administration ("OOSA") and the Illinois Opioid Remediation Advisory Board ("IORAB"). Gov. J.B. Pritzker, Exec. Order No. 2022-19 (August 30, 2022). The Executive Order, among other things, makes the IORAB a sub-committee of the Governor's Opioid Overdose Prevention and Recovery Steering Committee ("Steering Committee"), tasked with making recommendations to the Committee regarding the spending of the Illinois Remediation Fund for "forward-looking Approved Abatement Program uses." *Id.* at Sec. 4.

16. Likewise, the Illinois statute that establishes the Illinois Remediation Fund as a trust fund in the State treasury, states that all funds directed into the Illinois Remediation Fund "shall be used in accordance with the Illinois Opioid Allocation Agreement, effective December 30, 2021, and exclusively for approved abatement programs." 30 ILCS 105/6z-133.

17. The OOSA is led by a Statewide Opioid Settlement Administrator who works collaboratively with the IORAB to develop funding recommendations to present to the Steering Committee.

18. To date, the Steering Committee has approved numerous recommendations made by the IORAB regarding the use of monies in the Illinois Remediation Fund. Accordingly, these monies have been and continue to be used to fund a variety of opioid abatement purposes

throughout Illinois, including but not limited to, increasing access to naloxone, increasing access to medication-assisted recovery, expanding services for pregnant and postpartum women with opioid use disorder, and increasing telehealth services in underserved communities.

19. Pursuant to Illinois' Allocation Agreement, as well as an additional agreement between the State and the City of Chicago, the next largest bucket, 33%, of Walgreens' Annual Remediation Payments are distributed directly to Illinois local governments. Local governments determine the amounts and Approved Abatement Programs that their share of the opioid settlement proceeds are used to fund. In addition, a portion of these funds have gone to attorney's fees for local governments with outside counsel.

20. Accordingly, only 12% of all Walgreens' Annual Remediation Payments flow directly to the State of Illinois.

21. The 12% State share of remediation funds is used for administrative costs associated with the Illinois Remediation Fund, as well as for Approved Abatement Programs.

22. The 12% State share has been used in part toward funding a grant awarded to a third-party, the Regional Care Coordinating Agency, run by Advocates for Human Potential, Inc. (AHP), to assist with the administrative responsibilities relating to the Illinois Remediation Fund, including developing and administering notices of funding opportunities and awardees for abatement programs that have been approved by the Steering Committee. AHP also works with the Illinois Attorney General's Office and the Illinois Department of Human Services to develop and maintain the Illinois Opioid Settlements Initiative website, www.ilopioidsettlements.com, and the Illinois Regional Care Coordination Agency website, www.ilrcca.com. These websites provide extensive information on available funding opportunities, past awards, and how opioid settlement monies have been spent in Illinois.

23. Monies from the 12% State share have also been allocated for various Approved Abatement Programs, including expansion of the State's Medication Assisted Recovery Now program, support and expansion of naloxone distribution across the State, and expanding prevention services for children facing homelessness and parental substance use.

24. In addition to the State directly receiving only a minor share of the Walgreens' Annual Remediation Payments, these payments are to be paid over an extended number of years, with the final payment not being made until 2036. This also means the payments are subject to uncertainty and dependent on the company's financial health over the next decade.

25. After the Annual Remediation Payments, the next largest financial component of the Walgreens National Settlement Agreement are fees and costs for private attorneys. These monies are distributed to various funds and sub funds and their distribution, to outside counsel for local governments and for states, is overseen by an appointed fee panel and committee, respectively. None of the funds flow to the State and, as Illinois was not represented by outside counsel in relation to its opioid-related claims against Walgreens, none of these funds flow to outside counsel.

26. In addition to the fees and costs for outside counsel, there is a small portion of the settlement monies, referred to as Additional Remediation, that is allocated under the settlement to states, including Illinois, for reimbursement of their investigation and litigation costs.

27. The work involved in the Walgreens National Settlement Agreement was handled in the Illinois Attorney General's Office by attorneys in the Consumer Protection Division (including in the Consumer Fraud Bureau and the Health Care Bureau) and by a senior Executive Deputy Attorney General.

28. None of the funds received by Illinois under the Walgreens National Settlement Agreement have gone to reimburse the Illinois Medicaid program.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 3rd day of February, 2026 in Chicago, Illinois.

/s/ Andrea Law _____

Andrea Law