UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America, and the States of North Carolina and Tennessee, et al, *ex rel*. T.J. Novak,<br><br>            Plaintiffs-Relator,<br><br>v.<br><br>Walgreens Boots Alliance, Inc.,<br><br>            Defendant. | Case No. 18 C 5452<br><br>Judge Joan H. Lefkow |

**STATE OF NORTH CAROLINA'S AND STATE OF TENNESSEE'S ("THE STATES") JOINT OPPOSITION TO RELATOR NOVAK'S MOTION FOR A DECLARATORY JUDGMENT**

**FACTUAL BACKGROUND**

Relator seeks a share of a $5.52 billion settlement negotiated by State Attorneys General with Defendant and entered by 46 state courts that provides States with funds to abate the nationwide opioid crisis. The settlement was prompted by thousands of state and local government public nuisance and consumer protection lawsuits pending against Walgreens in an MDL proceeding in Cleveland and numerous state courts, rather than any whistleblowing by Relator. Indeed, by the time Relator filed his *qui tam* suit in this Court on August 10, 2018, the nature and scope of the opioid crisis—and the conduct of the companies contributing to it—were well known to state and local governments (and to the public at large). Numerous books, investigative reports, and national media stories had documented the failures of manufacturers, distributors, and pharmacy chains to maintain effective controls against diversion.[1]

Governmental investigations of Walgreens' role in the opioid crisis first resulted in legal action by September 2012, almost six years before Relator filed suit, when the company received

---

[1] *See* Request for Judicial Notice ("RJN"), ¶1; Ex. A-1 to A-5 of RJN.

an immediate suspension order ("ISO") from the Drug Enforcement Administration ("DEA"), shutting down Walgreens' Jupiter, Florida Distribution Center.[2] In the ISO, DEA found Walgreens "failed to maintain effective controls against the diversion of controlled substances."[3] Walgreens entered a widely publicized settlement with DEA to resolve claims that its distribution centers in Florida ignored suspicious orders from numerous of its pharmacies. The settlement, the largest in DEA history, resolved allegations that Walgreens "committed an unprecedented number of record-keeping and dispensing violations" and "negligently allowed controlled substances…such as oxycodone and prescription pain killers, to be diverted for abuse and illegal black market sales."[4]

By the time of Relator's suit in August 2018, Walgreens was the subject of active litigation by both state and local governments.[5] Delaware sued Walgreens in January 2018, asserting public-nuisance and consumer-protection claims based on the same core factual allegations later repeated in Relator's complaint.[6] Kentucky did the same in June 2018.[7] Both complaints featured allegations similar to Relator's later suit, including pharmacists' failures to properly determine the validity of controlled substance prescriptions.[8]

More than 300 counties, cities, and other local governmental entities had sued Walgreens before Relator filed suit.[9] The volume of litigation against Walgreens and other defendants grew so rapidly that the Judicial Panel on Multidistrict Litigation established the National Prescription Opiate MDL 2804 in December 2017, a full eight months before Relator's action, to coordinate

---

[2] *See* RJN, ¶2; Ex. B to RJN.
[3] *Id.* at Ex. B, p. 3, ¶6.
[4] *See* RJN, ¶3; Ex. C to RJN.
[5] Declaration of Michael Leftwich, ("Leftwich Decl."), ¶¶12-13.
[6] *Compare* Ex D to RJN, ¶¶186-191, *and* Ex. E to RJN, ¶¶112-115, 127; *with* ECF 1 ¶¶37-40, *and* ECF 21, ¶¶37-40, 95-98.
[7] *See* RJN, ¶5. Ex. E to RJN; Leftwich Decl., ¶14.
[8] *See* Ex D to RJN, ¶¶186-191; Ex. E to RJN, ¶¶112-115.
[9] Leftwich Decl., ¶12; Declaration of Kimberley D'Arruda, ("D'Arruda Decl."), ¶5.

these cases. *In re Nat'l Prescription Opiate Litig*, 290 F. Supp. 3d 1375 (J.P.M.L. 2017).

At the same time, the DEA shared its opioid transaction data with state attorneys general.[10] This data allowed North Carolina, Tennessee, and other states to track prescription opioids through the distribution chain and focus on problematic dispensers, including Walgreens.[11] In short, the factual basis for Relator's allegations against Walgreens was neither unknown nor undisclosed to the States; it had been publicly aired, investigated, and litigated for years.

Relator's claims under the Tennessee Medicaid False Claims Act (TMFCA) and the North Carolina False Claims Act (NCFCA) were thus filed long after state and local governments, including those in Tennessee and North Carolina, were actively investigating and prosecuting claims against Walgreens.[12] And none of Relator's three complaints contain any specific factual allegations that directly pertain to North Carolina or Tennessee. ECF 1, 7, 21.

Because of the degree of misconduct by the pharmaceutical industry, and the volume of litigation, the most responsible companies sought global settlements to fully resolve their civil liability to state and local governments arising from the national opioid crisis.[13] The first wave of global settlements, with the nation's three largest pharmaceutical distributors and a manufacturer, were announced in July 2021.[14] The Walgreens Settlement Agreement ("Agreement"), from which Relator seeks to recover, was part of a second wave of agreements between the States and three pharmacy chains and two manufacturers announced in late 2022.[15] The structure of these five agreements and many of the key provisions generally followed the prior first wave settlements.[16]

---

[10] *See* RJN, ¶7, Ex. F to RJN; Leftwich Decl., ¶11; D'Arruda Decl., ¶4.
[11] Leftwich Decl., ¶11; D'Arruda Decl., ¶4.
[12] Leftwich Decl., ¶11; D'Arruda Decl., ¶5.
[13] Leftwich Decl., ¶16.
[14] *See* RJN, ¶8, Ex. G to RJN; Leftwich Decl., ¶¶16-17.
[15] *See* RJN, ¶9, Ex. H to RJN; Leftwich Decl., ¶18-19.
[16] *Id.*

After the Agreement was finalized, it was joined by 46 states and thousands of local governments, referred to as "subdivisions" in the settlement.[17]

Settlement funds were not directed to resolve fraud claims on behalf of the states' Medicaid programs, and no portion of the Agreement called for payment to state Medicaid programs or the federal government for its share of Medicaid dollars.[18] Rather, the Agreement has multiple provisions restricting a vast majority of the settlement funds to opioid remediation, which is a defined term in the agreement.[19] The Agreement allows each state to develop its own consensual or statutory approach for allocating the money within the state.[20] For example, in North Carolina, subdivisions receive 84.62 percent of abatement funds, with the use of those funds having to be approved by the subdivisions' elected officials and restricted to specified measures related to addressing the opioid crisis, and 15 percent is appropriated by the General Assembly.[21] In Tennessee, subdivisions receive 15 percent of abatement funds, a specially created opioids abatement trust fund receives 70 percent, and the remaining 15 percent are directed to the general fund, to be allocated for remediation by the Legislature.[22] Walgreens settlement funds paid into the irrevocable trust are disbursed by an independent Opioid Abatement Council and all the trust's funds must be spent on future abatement, including shares directed to the counties. Tenn. Code Ann. §§ 33-11-103(p); 9-4-1301.[23]

The Agreement was implemented through the filing of individual consent judgments in the

---

[17] Leftwich Decl., ¶19.
[18] *Id.* ¶20.
[19] Leftwich Decl., ¶20; Ex. H to RJN, §§ I.UU, V.B, V.D.1-2, V.E.2.
[20] *See* Ex. H to RJN, § V.D.1-2; Leftwich Decl., ¶28.
[21] D'Arruda Decl., ¶¶14-15. The remaining 0.38 percent goes to North Carolina-based outside counsel for litigating subdivisions. *Id*.
[22] Leftwich Decl., ¶30.
[23] *Id*.

state courts of all participating states.[24] The consent judgments approved the Agreement and gave effect to its terms.[25] Many of the individual state judgments were individualized to address releases and intrastate allocation. For example, the Tennessee consent judgment, entered by the Knox County Circuit Court on January 4, 2024, approves the Tennessee State-Subdivision Opioid Abatement Agreement as the means by which settlement payments will be allocated within the state and addresses the statutory bar releasing government entity claims against Walgreens pursuant to Tenn. Code Ann. § 20-13-203.[26] Similarly, the North Carolina consent judgment, entered by the Wake County Superior Court on November 3, 2023, provides that the North Carolina Supplemental Agreement for Additional Funds From Additional Settlements of Opioid Litigation entered into between the Attorney General and 136 local governments "is hereby approved by the Court as the means by which relevant funds paid pursuant to the Agreement will be allocated, used, and accounted for within the State …"[27] Neither the Tennessee nor North Carolina consent judgments provide for any payment to reimburse the states' Medicaid funds or to the Relator.[28]

Though the Walgreens settlement did not arise from Medicaid fraud claims, the Agreement provides a broad release of all civil claims that states (and subdivisions) could assert, which included *qui tam* actions.[29] The release did not reference Relator's case, which was under seal at the time of the Agreement's negotiation and therefore presumably unknown by Walgreens.[30] The Agreement's coverage of *qui tam* claims matched the scope of the release in the pharmaceutical

---

[24] Leftwich Decl., ¶31; Ex. K to RJN, Ex. L to RJN, Ex. H to RJN, § VIII.B.
[25] Leftwich Decl., ¶31; *see also* Ex. K to RJN, ¶5; Ex. L to RJN, ¶¶8, 11.
[26] Leftwich Decl., ¶32; *see also* Ex. L to RJN, ¶¶14, 19.
[27] D'Arruda Decl., ¶¶8-9; *see also* Ex. K to RJN, ¶8.
[28] Ex. K to RJN, Ex. L to RJN.
[29] Leftwich Decl., ¶23.
[30] *Id.*, ¶25.

distributors' 2021 settlement of the States' opioid claims, even though no state Medicaid fraud *qui tam* claims were pending against the distributors.[31]

To comply with the terms of the Agreement,[32] the named States intervened in the action for the limited purpose of filing a motion to dismiss the States' claims. This Court granted the States' request, dismissing the States' claims brought by Relator under each state's false claim act with prejudice. ECF 33 at p. 2, ¶1. The order also provided that "[r]esolution of the issue of whether Relator is entitled to a share of one or more State's share of its Settlement Fund, and if so, what that share would be, is postponed until after the United States' claims in this case against Defendant have been resolved"—without providing in which venues such resolution would occur. *Id*., ¶3.

On April 18, 2025, the United States and Relators announced a $300 million settlement of the federal claims and the federal share of the state claims. Of that, $150 million was allocated to violations of the federal False Claims Act. Relator Novak received a share totaling approximately $30 million when factoring in contingency payments. ECF 69 at p. 7 ¶2. The court entered orders upon joint motions dismissing the federal claims with prejudice, purporting to retain jurisdiction over the state share of the state Medicaid claims that had been dismissed already. ECF 72 at pp. 3-4 ¶¶2, 3; ECF 82 at p. 1 ¶¶1, 2. The states were not parties to the joint motions, as they already were dismissed from the case with prejudice, and were not advised before the motions or the proposed orders were filed. Relator's motion followed.

## ARGUMENT

**I.    RELATOR'S DECLARATORY MOTION IS IMPROPER IN THIS LAWSUIT.**

    **A.    Declaratory judgment cannot be sought because it was neither pled in the complaint nor is against parties named as defendants.**

Relator's pending motion should be denied for the simple reason that it is procedurally

---

[31] *Id*., ¶24.
[32] *Id*., ¶¶26-27.

improper. "A party may not make a *motion* for declaratory relief, but rather, the party must bring an *action* for a declaratory judgment." *Kam-Ko Bio-Pharm Trading Co., Ltd. v. Mayne Pharma (USA Inc.)*, 560 F.3d 935, 943 (9th Cir. 2009).[33] Relator has failed to amend his complaint, seek permission to amend, or otherwise place the states on notice. Fed. R. Civ. P. 15. Nor has Relator sought to add the States as parties in order to bring a crossclaim. Fed. R. Civ. P. 13(g), 20.

Not allowing Relator to seek an unpled Declaratory Judgment action by motion is not a formality, but reflects the alignment of the parties as pled in Relator's complaint. In a *qui tam* action under the NCFCA and TMFCA, a relator brings the claim on behalf of the state as well as on his own behalf. N.C. Gen. Stat. § 1-608(b); Tenn. Code Ann. § 71-5-182. Neither of the States was named by Relator as a defendant (or a cross-claim defendant) in the instant lawsuit. Instead, the situation is precisely the opposite: Relator's role in this instant lawsuit as currently pled is to "stand[] in the shoes of the government[s]." *U.S. ex rel. Robinson v. Healthnet Inc.*, 124 F.4th 511, 514 (7th Cir. 2024). Relator cannot hijack his sole-pled role of standing in the shoes of the states to seek entry of judgment against the parties on whose behalf he purported to bring the action.

**B.      Declaratory judgment cannot be sought through a motion in the same lawsuit where the predicate state law claims were already dismissed with prejudice.**

The only causes of action before this Court related to the States were the claims under the NCFCA and TMFCA. These claims were "dismissed with prejudice" by this Court in January 2024. ECF 33 at 2 ¶1. Accordingly, there is no live claim over which this Court has any jurisdiction to proceed with respect to the States.

Even if the States' settlement with Walgreens had been entered by this Court rather than by state courts in North Carolina and Tennessee,[34] this Court would be without jurisdiction over

---

[33] District courts in this Circuit have ruled similarly. *See, e.g. Sisson v. Gowdy*, No. 1:22-cv-00514-JPH-MJD, 2023 WL 2973768 (S.D. Ind. Apr. 17, 2023).
[34] While this Court entered a settlement resolving federal FCA claims, that settlement does not address state

subsequent disputes. "[W]hen a suit is dismissed with prejudice, it is gone, and the district court cannot adjudicate disputes arising out of the settlement that led to the dismissal merely by stating that it is retaining jurisdiction." *Dupuy v. McEwen*, 495 F.3d 807, 809 (7th Cir. 2007).[35] Here, all of Relator's NCFCA and TMFCA claims were dismissed with prejudice. The Court may not retain jurisdiction over disputes involving those claims despite that dismissal.

## II. STATUTORY AND CONSTITUTIONAL BARRIERS PREVENT THIS COURT FROM ENTERING A DECLARATORY JUDGMENT AGAINST THE STATES.

### A. The Court does not have diversity or federal question jurisdiction over a declaratory judgment action against the States that arises under state law.

Relator asks this Court to rule on questions under 28 distinct state laws. Even if the motion were procedurally proper, the Court has neither diversity nor federal question jurisdiction over claims against the States that arise purely under state laws.

The question of diversity jurisdiction can be quickly resolved. "There is no question that a State is not a 'citizen' for purposes of the diversity jurisdiction." *Moor v. County of Alameda*, 411 U.S. 693, 717 (1973).

Courts may exercise federal question jurisdiction over "civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Accordingly, a court may issue a declaratory judgment "in a case of actual controversy within its jurisdiction." 22 U.S.C. § 2201(a). However, a court may only maintain jurisdiction over a declaratory judgment action when a hypothetical suit under the same set of facts would satisfy the well-pleaded complaint rule to confer federal question jurisdiction. *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463

---

claims against Walgreens and Relator's claim for a share of that settlement has already been fully resolved.
[35] Relator relies on *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634 (6th Cir. 2003) ("*Bledsoe I*"). *Bledsoe I* involved a case where the federal government had not intervened to dismiss the original *qui tam* case (or to take any other action) and where the relator still had a live *qui tam* claim. *Id*. at 647. Here, the States did intervene to dismiss their claims and there is no live claim under the NCFCA or the TMFCA. Moreover, the demand for a relator share from the federal government in *Bledsoe I* was a question of federal law over which any federal court would have federal question jurisdiction.

U.S. 1, 16-17 (1983). In other words, 22 U.S.C. § 2201 cannot be the sole federal law at issue in the dispute. The Seventh Circuit applies the following test: "[I]n an action for declaratory judgment the positions of the parties are reversed: the declaratory-judgment plaintiff would have been the defendant in the anticipated suit whose character determines the district court's jurisdiction." *DeBartolo v. HealthSouth Corp.*, 569 F.3d 736, 741 (7th Cir. 2009).[36]

There is no hypothetical lawsuit involving Relator's disputed demand to a relator's share over which this Court would have subject matter jurisdiction. All possible actions by Relator against the States arise under state law—the alternate remedy provisions found in N.C. Gen. Stat. § 1-609(h) and Tenn. Code Ann. § 71-5-183(c)(5)—over which this court has neither diversity nor federal question jurisdiction. Relator's declaratory judgment action, which arises under 28 different states' laws, fails under the Seventh Circuit's federal question jurisdictional test.

> **B.** **The Court should decline supplemental jurisdiction over pure state law questions when the federal law claims have been fully resolved.**

The Court may exercise supplemental jurisdiction over state claims when they are related to the claims within its original jurisdiction. 28 U.S.C. § 1367(a). But a court may decline supplemental jurisdiction when (1) the claim raises a novel or complex issue of state law, (2) the claim substantially predominates over the federal claims, (3) the federal claims have been dismissed, or (4) there are other compelling reasons to decline jurisdiction. *Id.* § 1367(c).

The Seventh Circuit has held that when all federal claims are dismissed, "the district court should relinquish jurisdiction over pendent state-law claims." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 727 (7th Cir. 1998). Courts in this Circuit therefore only retain federal jurisdiction over pendent state claims when "unusual circumstances exist." *Hawkins v. Trs. of Ind.*

---

[36] *See also Capitol Broad. Co. v. City of Raleigh*, 104 F.4th 536, 540 (4th Cir. 2024) ("Regardless of which roles the parties take on in the hypothesized coercive suit, if *that* suit would satisfy the well-pleaded complaint rule, then the overarching declaratory judgment action does too.").

*Univ.*, 83 F. Supp. 2d 987, 1002 (S.D. Ind. 1999). The Court may consider factors including "judicial economy, convenience, fairness and comity" when making this determination. *Id*.

Here, the federal False Claims Act claims that originally gave this court federal question jurisdiction over the case were fully dismissed with prejudice on October 23, 2025. ECF 82 at 1 ¶1. Further, the relevant factors weigh strongly against the exercise of jurisdiction. The Court will best promote judicial economy, fairness, and comity with state courts by declining jurisdiction over Relator's 28 state law claims. Judicial economy, fairness, and comity will best be promoted in each individual state court, as those courts are best poised to navigate complex and novel state law issues regarding alternate remedies and resolve disputes regarding their own settlement orders.

### C. The Court must afford full faith and credit to the state court judgments that effectuate the multistate opioid settlement and do not provide a relator's share.

The Court must give full faith and credit to all relevant state court judgments resolving the States' opioid claims. Federal courts are required to treat state court judgments as valid and enforceable. 28 U.S.C. § 1738. A state court settlement is treated the same in federal court as it would be in state court. *See 4901 Corp. v. Town of Cicero*, 220 F.3d 522, 529 (7th Cir. 2000) (upholding settlement and requiring lower court to apply the same preclusion principles as a state court would).

Here, each state court entered a consent judgment incorporating the Agreement. The Court must honor those state court judgments. Ordering a declaratory judgment in federal court would directly contradict the state judgments that do not provide for a relator's share.[37] To the extent that Relator wants relief from those state court judgments so that they provide for a relator's share, he must seek that relief from the state courts that entered them.[38]

---

[37] Ex. L to RJN; Ex. K to RJN; *see also* D'Arruda Decl., ¶17.
[38] Although state court is the right forum where to litigate the question, the States maintain such relief would be substantively improper.

### D. The Eleventh Amendment bars the federal court alternate remedy action.

Suits against states in federal court for monetary damages are barred by the Eleventh Amendment. A suit for monetary damages is determined by whether the action would deplete the state treasury. *Benning v. Bd. of Regents of Regency Univs.*, 928 F.2d 775, 777 (7th Cir. 1991). "[D]eclaratory relief should not be awarded where the [E]leventh [A]mendment bars an award of monetary and injunctive relief; otherwise, the relief would operate as a means of avoiding the amendment's bar." *MSA Realty Corp. v. Illinois*, 990 F.2d 288, 295 (7th Cir. 1993).

Relator's request for an alternate remedy from a portion of the States' opioid settlement with Walgreens is a request for recovery of money from the States' treasuries. Pursuant to Section 9F.1.(a) of North Carolina Session Law 2022-74, "funds received by the State as a result of a settlement . . . relating to claims regarding the manufacturing, marketing, distribution, dispensing, or sale of opioids" are placed into "The Opioid Abatement Reserve (Reserve) [that] is established in the General Fund" of the State of North Carolina.[39] Similar, in Tennessee, the State's settlement payments are made to the State Treasury, with most abatement funds directed to the Opioid Abatement Trust Fund and the remaining amount paid to the General Fund.[40] Accordingly, Relator seeks recovery of funds from the States' treasuries.

While a state may waive Eleventh Amendment immunity explicitly, *Lane v. Pena*, 518 U.S. 187, 192 (1996), the NCFCA and TMFCA do not contain any language that have unequivocally abrogated Eleventh Amendment immunity. Therefore, the Eleventh Amendment immunity bars Relator's request for a declaratory judgment.[41] It is irrelevant to Eleventh

---

[39] *See also* D'Arruda Decl., ¶16.
[40] Leftwich Decl., ¶¶28-30.
[41] Although the States intervened for the limited purpose of dismissing their *qui tam* claims against Walgreens, that action did not waive immunity from suit for all claims, much less Relator's motion for a relators share. Instead, it provided that Relator was not barred from later proceeding, in an otherwise appropriate forum, to litigate its claim to a relator share. *See* ECF 33 at p. 2 ¶3.

Amendment analysis whether the state law alternate remedy provision allows for Relator to obtain a judgment against the States in their state courts because "a State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation." *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999).

**III.     EVEN IF THE DECLARATORY JUDGMENT MOTION CAN BE DECIDED ON THE MERITS, THE MOTION SHOULD BE DENIED.**

**A.     Relator has no right to a share of the multistate opioid settlement, because it resolved claims that Relator could not assert in his *qui tam* lawsuit.**

"[A]lternative remedial proceedings from which a relator can recover a share must redress the same type of falsity and fraud claims that otherwise could be pursued by a private relator's qui tam lawsuit under the False Claims Act." *United States v. Novo A/S*, 5 F.4th 47, 56 (D.C. Cir. 2021). "[I]f the alternate proceeding seeks recompense for some other type of claim that the relator could not have brought, then the proceeding . . . is a different legal claim altogether, arising beyond the False Claims Act's borders," and thus beyond a relator's reach. *Id.*[42]

Relator could not bring the public nuisance and consumer protection claims on behalf of the States that formed the basis for their settlement with Walgreens. For these reasons, he has no right to a share of the settlement of those claims, particularly given that the proceeds from those settlements are largely devoted to prospective nuisance abatement, with no funds specifically allocated to resolve Medicaid claims or specifically directed to state Medicaid programs.[43]

**B.     The *qui tam* claim lacks merit, so it provides no right to alternate remedies.**

Even if Relator can assert a claim for share of settlement proceeds from causes of action he could not assert, he is still not entitled to a share because his *qui tam* lawsuit is not valid. After remanding to the district court for an analysis on whether the relator's *qui tam* complaint complies

---

[42] Tennessee and North Carolina law are similar to federal law here. *Compare* Tenn. Code Ann. § 71-5-183(c)(5) *and* N.C. Gen. Stat § 1-609(h) *with* 31 U.S.C. §3730(c)(5).
[43] Leftwich Decl, ¶¶7, 20; D'Arruda Decl., ¶17.

with the requirements of Rule 9(b) in *Bledsoe I*, the Sixth Circuit was asked to confirm that if a relator's *qui tam* cannot survive dismissal, he would not be entitled to any settlement share as an alternate remedy. The Sixth Circuit answered in the affirmative. *See U.S. ex rel. Bledsoe v. Community Health Sys., Inc.*, 501 F.3d 493, 522 (6th Cir. 2007) ("*Bledsoe II*") ("Absent a valid complaint which affords a relator the possibility of ultimately recovering damages, there is no compelling reason for allowing a relator to recover for information provided to the government.").

### 1. The Public Disclosure Bar Renders Relator's Claims Invalid

The public disclosure bar renders relator's original *qui tam* invalid. The NCFCA and TMFCA, like the federal FCA, contain provisions requiring dismissal of a *qui tam* claim when substantially the same allegations or transactions as alleged in the claim were already publicly disclosed, whether in a civil action, administrative hearing, a legislative or state report, or from the news media. Tenn. Code Ann. § 71-5-183(e)(2); N.C. Gen. Stat. Ann. § 1-611(e). The purpose of the bar is "to deter parasitic *qui tam* actions, and once information becomes public, only the Attorney General and a relator who is an 'original source' of the information may represent" the government. *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009).

The Seventh Circuit has adopted a three-step analysis to determine when a *qui tam* must be dismissed pursuant to the public disclosure bar. *Id*. First, courts are directed to determine whether the allegations in the complaint have been "publicly disclosed" through an enumerated channel. *Id.* If so, the court must then determine whether the relator's suit is "based upon" or "substantially similar to" the publicly disclosed allegations. *Id.* at 913, 920. The public disclosure bar will then preclude the action unless "the relator is an 'original source' of the information upon which the lawsuit is based." *Id.* at 913. The relator bears the burden of proof at all three steps. *Id.*

A public disclosure occurs "when the critical elements exposing the transaction as fraudulent are placed in the public domain." *Cause of Action v. Chi. Transit Auth.*, 815 F.3d 267,

274 (7th Cir. 2016). There are two meanings to "in the public domain": (1) where "the information is open or manifest to the public at large," *id*.; and (2) where the "facts disclosing the fraud itself are in the government's possession." *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 708 (7th Cir. 2014). "The Government's possession of the information exposing a fraud is alone sufficient to trigger the public-disclosure bar." *Cause of Action*, 815 F.3d at 275.

These definitions of "in the public domain" defeat Relator's claims. As detailed *supra*, pp. 1-3, Walgreens' failure to properly dispense opioids was well-covered both in court proceedings and the media, and those facts were in North Carolina and Tennessee's possession when Relator filed suit.[44] Governmental investigations into Walgreens were public, and the company had already been sued by multiple states and more than 300 subdivisions before Relator filed suit in August 2018. His action contributed nothing to the States' recovery efforts.

Relator's *qui tam* lawsuit is also not saved by the second prong of the *Glaser* test. Even in the "absence of an explicit allegation of fraud, the public-disclosure bar may still apply so long as facts establishing the essential elements of fraud—and, consequently, providing a basis for the inference that fraud has been committed—are in the government's possession or the public domain." *Cause of Action*, 815 F.3d at 278 (cleaned up). The facts listed above that place Relator's allegations in the public domain support dismissal under this step, as well. While the prior investigations and litigation were generally based on the Controlled Substances Act and state nuisance and consumer protection claims, all the facts the States could have used to assert a fraud claim were already in the possession of the States when Relator filed his *qui tam* action.[45]

This all stacks against Relator as an original source of information related to Walgreens'

---

[44] Leftwich Decl., ¶¶9-15; D'Arruda Decl., ¶¶4-5.
[45] *Compare* Ex D to RJN, ¶¶186-191, *and* Ex. E to RJN, ¶¶112-115, 127; *with* ECF 1 ¶¶37-40, *and* ECF 21, ¶¶37-40, 95-98.

opioid prescription practices. While he alleged witnessing problematic behavior while employed by an Illinois Walgreens, ECF 21 ¶¶103, 108, the fact remains that the company's failures and wrongdoing in dispensing opioids was public knowledge by the time Relator filed his *qui tam* lawsuit in August 2018. This prior public disclosure serves as a clear bar to Relator's claim, and in turn prohibits him from recovering any settlement share as an alternate remedy.

### 2. Relator Fails to State a Plausible Fraud Claim

Notwithstanding the public disclosure bar issues, a relator whose *qui tam* lawsuit would be subject to dismissal under Fed. R. Civ. P. 12(b)(6) and 9(b) would not be eligible to assert any claim for an alternate remedy. *Bledsoe II*, 501 F.3d at 522. Relator cannot clear this hurdle.

First, Relator's complaint alleged no specific facts related to Medicaid fraud in any state other than Illinois, which dooms its compliance with Rule 9(b) with respect to the NCFCA and TMFCA claims. ECF 21 ¶¶59, 85, 87. Second, a recent decision out of the Middle District of Florida illustrates the challenges faced by relators bringing *qui tam* actions under the FCA for opioid over-prescription practices. The relator in *United States ex rel. Publix Litig. P'ship, LLP v. Publix Super Mkts., Inc.* alleged a very similar theory of liability as the Relator here. Case No. 8:22-cv-2361-TPB-AAS, 2025 WL 5468832, at *4-6 (M.D. Fla. Aug. 27, 2025). The court found that even though the defendants "may certainly have been engaging in bad business practices and procedures that might support a negligence theory, nuisance theory, or even violations of the Controlled Substances Act," those practices do not "support a claim under the False Claims Act." *Id.* at *17. Relator has not even attempted to show that his allegations are distinguishable. Therefore, he should be barred from asserting any right to unrelated settlement proceeds as an alternate remedy.

### CONCLUSION

This Court should deny Relator's motion.

Dated: February 3, 2026        Respectfully submitted,

                                      STATE OF NORTH CAROLINA
                                      JEFF JACKSON, ATTORNEY GENERAL

By:   /s/ Daniel P. Mosteller
      Daniel P. Mosteller
      Associate Deputy Attorney General
      N.C. State Bar No. 36958
      (919) 716-6026
      dmosteller@ncdoj.gov

      Allyson S. Barkley
      Chief Deputy Fellow
      N.C. State Bar No. 63780
      (919) 716-0151
      abarkley@ncdoj.gov

      North Carolina Department of Justice
      Post Office Box 629
      Raleigh, North Carolina 27602

      *Counsel for the State of North Carolina*

      STATE OF TENNESSEE
      JONATHAN SKRMETTI, ATTORNEY GENERAL

By:   /s/ Kevin M. Kreutz
      Kevin M. Kreutz, BPR No. 040686
      Deputy Attorney General
      Office of the Tennessee Attorney General
      P.O. Box 20207
      Nashville, TN 37202-0207
      Phone: (615) 313-0694
      kevin.kreutz@ag.tn.gov

      Taylor Davidson, BPR No. 038514
      Assistant Attorney General
      Office of the Tennessee Attorney General
      P.O. Box 20207
      Nashville, TN 37202-0207
      Phone: (615) 532-7404
      taylor.davidson@ag.tn.gov

      *Counsel for the State of Tennessee*

-17-

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on February 3, 2026, he caused a true and correct copy of **STATE OF NORTH CAROLINA'S AND STATE OF TENNESSEE'S ("THE STATES") JOINT OPPOSITION TO RELATOR NOVAK'S MOTION FOR A DECLARATORY JUDGMENT** to be served via the Court's ECF/electronic mailing system upon all counsel of record.

By: /s/ Daniel P. Mosteller
Daniel P. Mosteller
Associate Deputy Attorney General
N.C. State Bar No. 36958
(919) 716-6026
dmosteller@ncdoj.gov