UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* T.J. NOVAK, <br><br> Plaintiffs-Relator, <br><br> v. <br><br> WALGREENS BOOTS ALLIANCE, INC., <br><br> Defendant. | Case No. 18 C 5452 <br><br> Judge Joan H. Lefkow |

**COMMONWEALTH OF VIRGINIA'S OPPOSITION TO PLAINTIFF-RELATOR'S MOTION FOR A DECLARATORY JUDGMENT THAT RELATOR IS ENTITLED TO A SHARE OF THE STATES' SETTLEMENT WITH WALGREENS**

COMMONWEALTH OF VIRGINIA

JAY JONES
Attorney General of Virginia

Thomas M. Beshere, III
Senior Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
(804) 823-6335
tbeshere@oag.state.va.us

The Commonwealth of Virginia ("Virginia" or "the Commonwealth") respectfully submits this brief in opposition to Relator T.J. Novak's ("Relator") Motion for a declaration that he is entitled to a share of Virginia's opioid settlement with Walgreens[1], which resolved state consumer protection and public nuisance claims and was confirmed in the Consent Judgment entered in *Commonwealth of Virginia v. Walgreen Co.*, No. CL 24000017-00 JSM (City of Richmond Circuit Court Jan. 10, 2024). Relator's Motion is procedurally and jurisdictionally defective, and in any event, the "alternate remedy" provision of the Virginia Fraud Against Taxpayers Act ("VFATA"), Va. Code § 8.01-216.6(H), does not afford the relief he seeks. Relator's Motion should be denied.

## I. FACTUAL AND LEGAL BACKGROUND

To avoid duplication, Virginia adopts and incorporates by reference the discussions at pages 1-6 and 13-15 in the Joint Opposition filed by North Carolina and Tennessee (ECF 182) and the declarations and exhibits referenced therein, including the exhibits submitted with their Request for Judicial Notice (ECF 184).

Virginia joined the Walgreens settlement when it was finalized in December of 2022. The settlement's overarching purpose is to provide funds to help state and local governments abate the opioid crisis, with an emphasis on prospective measures for reduction, prevention, and treatment of opioid use disorders. The settlement therefore requires the vast majority of settlement funds to be used for opioid remediation, *see* Settlement Agreement, §§ V.B, V.D.1-2, V.E.2, and contains a list of approved uses and strategies to illustrate the types of programs that qualify as opioid remediation. *Id*. at Ex. E. There is no provision for using settlement funds to resolve alleged Medicaid fraud claims or compensate state Medicaid programs for alleged fraud losses.

---

[1] A copy of the Walgreens Settlement Agreement is available at https://nationalopioidsettlement.com/wp-content/uploads/2023/10/2023.10.13-Updated-Walgreens-Multistate-Settlement-Agreement.pdf.

1

The Walgreens settlement allows each state to adopt its own framework for allocating settlement funds and its own use requirements for those funds, so long as they are no less stringent than those in the settlement agreement. Virginia has done this both by agreement and statute. The allocation and permitted uses of opioid settlement funds in Virginia are governed by the Virginia Opioid Abatement Fund and Settlement Allocation Memorandum of Understanding ("MOU") and the Virginia Opioid Abatement Authority Act, Va. Code § 2.2-2365, *et seq*.

The MOU was finalized in August of 2021. Ex. A, MOU. The Commonwealth receives 15% of each settlement distribution directly. *Id.*, § B.1. Its direct share is deposited in the Commonwealth Opioid Abatement and Remediation ("COAR") Fund, a dedicated fund that was established by the General Assembly (Virginia's state legislature) and is subject to legislative appropriation for opioid abatement and remediation. *See* Va. Code § 2.2-2377. The COAR Fund ensures the Commonwealth's direct shares are maintained separately, used for approved abatement and remediation purposes, and not commingled with other funds or diverted to other uses.[2]

Of the remaining 85% of each settlement distribution, Virginia's 133 counties and independent cities receive 30% directly.[3] Each county and city was required to approve—and did approve—the MOU to be eligible to receive distributions from opioid settlements that Virginia joins. The remaining 55% goes to another statutorily-created fund, the Virginia Opioid Abatement

---

[2] The MOU originally called for the Commonwealth's direct shares to be deposited in the Attorney General's Revolving Trust Fund and disbursed "to the Commonwealth's General Fund as provided by law" (Ex. A, MOU, § B.4), but that was superseded by statute in 2023 with the enactment of Va. Code § 2.2-2377. As a result, all the Commonwealth's direct shares from the Walgreens settlement have gone to the COAR Fund.

[3] The localities receive two 15% direct shares—one unrestricted and one restricted—for a total of 30%. These shares are allocated to the localities based on percentages adopted in the MOU. To the extent a settlement requires funds to be used "for abatement or similar purposes," direct share recipients must use any funds they receive—even funds that would otherwise be deemed "unrestricted"—for abatement purposes in accordance with the settlement. Ex. A, MOU, § B.6-7. Thus, any direct shares that Virginia localities receive from the Walgreens settlement are subject to the use restrictions in the settlement and must be used for opioid abatement and remediation in accordance with those restrictions.

Fund ("OAF"). Ex. A, MOU, § B.1-2, 5.

The General Assembly established the OAF in March of 2021. Va. Code. § 2.2-2374. In the same legislation, the General Assembly created the Virginia Opioid Abatement Authority ("OAA") as an independent agency to "abate and remediate the opioid epidemic…through financial support from the [OAF], in the form of grants, donations, or other assistance, for efforts to treat, prevent, and reduce opioid use disorder and the misuse of opioids in the Commonwealth." Va. Code § 2.2-2366. To fulfill this purpose, the OAA is empowered to "[m]ake grants and disbursements from the [OAF] that support efforts to treat, prevent, and reduce opioid use disorder and the misuse of opioids or otherwise abate or remediate the opioid epidemic[.]" Va. Code § 2.2-2369(1). The statute directs the OAA to allocate OAF funds as follows: 15% to state agencies; 15% to participating localities; 35% to "regional efforts" (abatement projects run by cooperative partnerships of two or more localities); and 35% to a fund that the OAA may use for administrative and staffing costs, and may distribute to state agencies, localities, and regional efforts to provide further support for abatement projects. Va. Code § 2.2-2374(D).

The OAA is required to evaluate potential projects and may approve distributions only for initiatives that are "designed to treat, prevent, or reduce opioid use disorder or the misuse of opioids or otherwise abate or remediate the opioid epidemic." Va. Code § 2.2-2370(A)(1). The statute lists various types of abatement efforts and expenditures that could satisfy this requirement. *Id.* Recipients may not use funds "to supplant funding for an existing program or continue funding an existing program at its current amount of funding," nor may they use funds for administrative costs or "any other purpose proscribed by the [OAA]." Va. Code § 2.2-2370(A)(3)&(4). Recipients must use funds to support prospective opioid abatement efforts. They also must report to the OAA on their use of funds and implementation of abatement efforts, and must "allow such monitoring

and review of the effort as may be required by the [OAA] to ensure compliance with the terms under which the support is provided." Va. Code § 2.2-2370(A)(5).

The OAA's reporting and use requirements are *more* stringent than those in the settlement agreement. Thus, in October of 2022, the OAA issued its "Gold Standard" policy, which incentivizes localities to satisfy the stricter OAA use and reporting standards for *all* settlement funds they receive, whether from the OAA or directly from the settlement. The policy offers localities a 25% "bonus" on top of their base distribution from the OAA if they satisfy the OAA's use and reporting standards for their direct shares as well as any funds they receive from the OAA.[4] To date, 70 of Virginia's 133 localities have satisfied the Gold Standard.[5]

In accordance with the Walgreens agreement, Virginia filed a Complaint and Consent Judgment in state court to implement the settlement. The Complaint asserts two claims on the public's behalf for violations of the Virginia Consumer Protection Act ("VCPA"), Va. Code § 59.1-196, *et seq.*, and public nuisance. Ex. B, Complaint, ¶¶ 1, 29-45. It contains no claim for Medicaid fraud, nor does it seek reimbursement to Virginia's Medicaid program. The Consent Judgment approves and incorporates the settlement agreement and the MOU, which are appended to it. Ex. C, Consent Judgment at 1, 4. The Consent Judgment was entered on January 10, 2024.

None of the Walgreens settlement funds received by Virginia have been used, nor will they be used, for payment or reimbursement to Virginia's Medicaid program. On January 1, 2026, the

---

[4] A copy of the OAA's Gold Standard policy is publicly available at https://www.oaa.virginia.gov/media/governorvirginiagov/oaa/pdf/Policy-for-Gold-Standard-Incentive-to-Cities-and-Counties---Adopted-Oct-24,-2022.pdf.

[5] This information is available on the OAA's online dashboard under the "City/County Projects" tab at https://dvf.dashboard.voaagrants.us/superset/dashboard/1/?standalone=3&show_filters=1. The qualifying localities include many of Virginia's largest cities and counties, including Fairfax County, Prince William County, Arlington County, Stafford County, Spotsylvania County, the City of Richmond, Henrico County, Chesterfield County, the City of Chesapeake, the City of Newport News, the City of Hampton, the City of Norfolk, the City of Virginia Beach, and the City of Roanoke. Those 14 localities alone represent more than half of Virginia's population.

OAA provided its 2025 Annual Report to Virginia's Governor and General Assembly, summarizing the grants issued by the OAA to Virginia's localities, state agencies, and cooperative partnerships in 2025.[6] *See* OAA 2025 Annual Report at 13-28. The Report also lists expenditures from the COAR Fund in the Commonwealth's 2025 Fiscal Year. *Id.* at 29. All these disbursements were used to initiate or renew prospective opioid remediation and abatement efforts. The combination of the settlement agreement's use restrictions, Virginia's statutory requirements, and the OAA's use and reporting standards ensures that Virginia's settlement distributions are used for their intended purpose—opioid abatement and remediation.

## II. ARGUMENT

### A. Declaratory Relief is Inappropriate and Unavailable Here

#### 1. Relator cannot seek declaratory relief by a motion

Relator has not filed an "appropriate pleading" to obtain relief under the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201(a). Courts have held that "a request for declaratory relief is properly before the court when it is ***pleaded in a complaint*** for declaratory judgment," and "[r]equests for declaratory judgment are not properly before the court if raised only in passing, ***or by motion***." *Arizona v. City of Tucson*, 761 F.3d 1005, 1010 (9th Cir. 2014) (emphasis added) (citing *Kam-Ko Bio-Pharm Trading Co. Ltd-Australasia v. Mayne Pharma (USA) Inc*., 560 F.3d 935, 943 (9th Cir. 2009)). In *Int'l Bhd. of Teamsters v. Eastern Conf. of Teamsters*, 160 F.R.D. 452, 456 (S.D.N.Y 1995), the court held "a party may not make a ***motion*** for declaratory relief, but rather, the party must bring an ***action*** for a declaratory judgment," and denied a "motion for declaratory judgment" as "inconsistent with the Federal Rules." District Courts in the Seventh

---

[6] A copy of the OAA's 2025 Annual Report is publicly available at https://www.oaa.virginia.gov/media/governorvirginiagov/oaa/documents/VOAA_AnnualReport-2025_FA.pdf.

5

Circuit have concurred. *See, e.g., Russell v. PS 27 Fam. L.P.*, No. 1:23-CV-405-CCB-SLC, 2025 U.S. Dist. LEXIS 38407, at *12 (N.D. Ind. Mar. 4, 2025) (denying motion for declaratory relief as "procedurally improper" because "the [DJA] authorizes declaratory judgment actions, not declaratory judgment motions within an active case") (citing *Centrifugal Acquisition Corp. v. Moon*, No. 09-C-327, 2010 U.S. Dist. LEXIS 7684, at *3-4 (E.D. Wis. Jan. 14, 2010)).[7]

Relator did not name Virginia as a defendant or seek declaratory relief against Virginia in any version of his Complaint. This is fatal to his Motion. In a *qui tam* action under VFATA, a relator sues on the Commonwealth's behalf and in its name. Va. Code § 8.01-216.5(A). But now Relator seeks to conjure a new lawsuit, turning Virginia and 27 other states into **defendants** and seeking judgment *against* the states on whose behalf he sued. The DJA does not empower a relator to seek declaratory relief he did not plead against parties he did not name as defendants.

Moreover, there is no longer any claim pending in this Court for which Relator can seek relief. The only claims pertaining to Virginia were Counts 29 and 59, which sought relief on Virginia's behalf under VFATA. Those claims were dismissed with prejudice on January 2, 2024. ECF 33. There is no relief this Court can give Relator when the claims upon which his Motion is predicated no longer exist and the party against whom he seeks relief was dismissed from the case. Relator's Motion is therefore fatally deficient and must be denied.

### 2. Relator has not asserted a valid *qui tam* claim as to Virginia

A valid *qui tam* claim is a prerequisite to a relator's right to recover a share of a state's settlement. *See United States ex rel. Bledsoe v. Community Health Sys., Inc.*, 501 F.3d 493, 522 (6th Cir. 2007). If a relator's *qui tam* claim would be dismissed under Fed. R. Civ. P. 9(b) or

---

[7] *See also Sisson v. Gowdy*, No. 1:22-CV-00514-JPH-MJD, 2023 U.S. Dist. LEXIS 66473, at *2-3 (S.D. Ind. Apr. 17, 2023) (denying "Motion for Declaratory Judgment" because plaintiff did not seek declaratory relief in his complaint).

6

12(b)(6), the relator is not entitled to a share. When a relator asserts *qui tam* claims under the laws of multiple states, the relator must "allege some specificity with respect to each asserted state and cannot rely upon generalized pleadings." *United States ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 357 (D. Mass. 2011).[8] A relator "cannot rely on conclusory allegations of nationwide fraud to support a claim that illicit conduct was carried out in particular states." *United States ex rel. Pepe v. Fresenius Medical Care Holdings*, 2024 U.S. Dist. LEXIS 198407, at *21 (E.D.N.Y. Oct. 31, 2024) (dismissing state-law claims where relator's complaint was "devoid of allegations of fraudulent conduct in any of the 15 non-intervening states").[9]

Here, no version of Relator's Complaint alleges any acts or events occurring in Virginia, nor does he allege even one instance of a false claim being submitted to Virginia's Medicaid program. Indeed, Relator does not allege any facts or fraudulent claims relating to any state other than Illinois. He offers only a perfunctory assertion that the occurrences he alleges are "consistent with Walgreens' policies and procedures throughout the United States." ECF 21, Second Am. Complaint, ¶ 38. This is insufficient to support a valid *qui tam* claim as to Virginia.

Moreover, a federal court in Florida recently dismissed a *qui tam* action against a retail pharmacy operator based on similar allegations of negligent or unlawful opioid dispensing. In *United States ex rel. Publix Litig. P'ship, LLP v. Publix Super Mkts., Inc.*, No. 8:22-cv-2361-TPB-AAS, 2025 U.S. Dist. LEXIS 166252 (M.D. Fla. Aug. 27, 2025), the court held that allegations of "bad business practices" and regulatory violations, even if true, did not state a claim under the False Claims Act ("FCA"). *Id.* at *10-17. Relator's allegations here are indistinguishable from

---

[8] *See also United States ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 723 (N.D. Tex. 2011) (holding that allegations of fraud in one state could not support an inference that similar frauds occurred in four other states).
[9] *See also United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 906 F. Supp. 2d 1264, 1277 (N.D. Ga. 2012) (holding that relator's alleged experiences at clinics in two states did not support an inference of a national fraudulent scheme).

7

those found lacking in *Publix*; thus, they cannot support a valid *qui tam* claim.

### B. The Court Lacks Jurisdiction to Adjudicate Relator's Motion

#### 1. The Court has neither diversity nor federal question jurisdiction

In addition to its procedural invalidity, Relator's Motion also fails for lack of jurisdiction. A state is not considered a "citizen" for diversity jurisdiction purposes and thus cannot be sued in federal court based on diversity of citizenship. *General Ry. Signal Co. v. Corcoran*, 921 F.2d 700, 705 n.3 (7th Cir. 1991) ("States cannot be sued as citizens in diversity.") (citing *Moor v. County of Alameda*, 411 U.S. 693, 717 (1973)). Thus, there is no diversity jurisdiction here.

There is also no federal question jurisdiction. The DJA does not confer jurisdiction on its own. A federal court has jurisdiction over a declaratory judgment action only to the extent it would have jurisdiction over the underlying dispute. *See C&E Servs. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) ("[T]he Declaratory Judgment Act 'is not an independent source of federal jurisdiction.'") (citing *Schilling v. Rogers*, 363 U.S. 666, 677 (1960)). The only "claim" Relator asserts as to Virginia is for a relator's share under VFATA, a ***state*** law. Even if Relator's underlying state Medicaid fraud claims had not been dismissed, they would be insufficient to confer jurisdiction here. *See Virginia ex rel. Hunter Labs., LLC v. Virginia*, 828 F.3d 281, 287-88 (4th Cir. 2016) (holding that a relator's *qui tam* claims for Medicaid fraud under VFATA did not arise under federal law, and federal courts therefore lacked jurisdiction to resolve a dispute over the relator's share). There is no issue of federal law here, and thus no federal question jurisdiction.

#### 2. The Court should decline to exercise supplemental jurisdiction

A federal court may decline supplemental jurisdiction over a state law claim if:

(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or

8

> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). All of these factors are present here.

First, the case raises novel and complex issues of state law. Relator's demand rests on the alternate remedy provision in VFATA. However, there are no decisions from a Virginia court interpreting or addressing the scope of that provision—much less any decisions involving a case like this, where a relator seeks to bootstrap a dismissed Medicaid fraud claim into a share of a settlement of consumer protection and public nuisance claims to abate a public health crisis. When a case raises issues of first impression under state law, supplemental jurisdiction should be declined. *Buethe v. Britt Airlines, Inc.*, 749 F.2d 1235, 1240 (7th Cir. 1984). It is "especially inappropriate for a federal court to make 'needless decisions of state law' when the court would not be interpreting or following established principles of state law, but rather would be required to decide difficult questions which the state courts have never addressed." *Id*. at 1241.

Second, the claims over which this Court had original jurisdiction—i.e., the federal FCA claims—have been dismissed. State law issues not only "predominate" here—they are literally the only things left. When the federal claims that provided the basis for jurisdiction drop out, courts should decline supplemental jurisdiction. *See Williams Electronics Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007) (affirming lower court's decision to decline supplemental jurisdiction after federal claims were disposed of and state claims presented "issues of unsettled state law").[10] Indeed, there is a **presumption** against exercising supplemental jurisdiction over state claims when the federal claims are dismissed before trial. *RWJ Mgmt. Co. v. BP Prods. N.*

---

[10] *See also Huffman v. Hains*, 865 F.2d 920, 923 (7th Cir. 1989) (affirming lower court's declination of supplemental jurisdiction, holding that when federal claims drop from a case before trial, "respect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law, become paramount concerns").

9

*Am.*, 672 F.3d 476, 479-80 (7th Cir. 2012). The presumption is rebuttable, but "concerns about judicial economy have their greatest force when significant federal judicial resources have already been expended to decide the state claims, or when there is no doubt about how those claims should be decided." *Id.* at 481. Here, Relator's Motion raises unsettled questions of Virginia law and **no** federal judicial resources have been expended on his state claims to date.

Relator attempts to salvage supplemental jurisdiction by arguing it would be more convenient to resolve these issues for all 28 states in one court. This is insufficient to overcome the factors that weigh strongly against exercising supplemental jurisdiction. In *Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, (11th Cir. 2015), for instance, the court held it was an ***abuse of discretion*** to exercise supplemental jurisdiction over "novel and complex" state law claims from ***nine*** different states, even though "it would be most convenient to try every claim in a single forum." *Id.* at 539-40. The court reiterated the "bedrock principle" that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law," and "'[s]tate courts, not federal courts, should be the final arbiters of state law' in our federalist system." *Id.* at 540 (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) and *Baggett v. First Nat'l Bank*, 117 F.3d 1342, 1351 (11th Cir. 1997)). The district court's retention of supplemental jurisdiction "resulted in the needless creation of new law for nine states" and was therefore wrong. *Id.* at 541. Exercising supplemental jurisdiction here would be similarly improper.

Third, there are other compelling reasons to decline supplemental jurisdiction. Contrary to Relator's suggestion, there is no one-size-fits-all result the Court could impose on 28 states. False claims statutes differ from state to state. Some, like Virginia's, present issues that have not been addressed in state courts. And there are significant differences in how states allocate their

10

settlement funds. Relator's demand would require the Court to enmesh itself in a complex web of allocation methodologies for 28 states to determine what, if any, portion of each state's recovery could be subject to a relator's share. Moreover, these methodologies carry the force of state law. In Virginia, they are mandated by a combination of judicial order, state statute, and agency rules and policies. Re-allocating settlement funds to Relator would require a modification of the state court judgment and a statutory amendment by the General Assembly. This Court is simply not situated to effectuate that kind of remedy for Virginia, much less 28 different states.

For all these reasons, the Court should decline supplemental jurisdiction.

### C. The Eleventh Amendment Bars Relator's "Claim" for a Relator's Share

The Eleventh Amendment to the Constitution immunizes states from suit in federal court by citizens of another state. U.S. Const. Amend XI; *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974) ("[T]his Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State."). This immunity applies to claims for declaratory relief. "[D]eclaratory relief should not be awarded where the [E]leventh [A]mendment bars an award of monetary and injunctive relief; otherwise, the relief would operate as a means of avoiding the amendment's bar." *MSA Realty Corp. v. Illinois*, 990 F.2d 288, 295 (7th Cir. 1993). The Supreme Court has held that any waiver of Eleventh Amendment immunity must be clear, unambiguous, and specific:

> The test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one. Although a State's general waiver of sovereign immunity may subject it to suit in state court, it is not enough to waive the immunity guaranteed by the Eleventh Amendment.…[I]n order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in ***federal court***.

*Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985).[11]

Virginia has not waived its Eleventh Amendment immunity. There is no provision in VFATA waiving this immunity or consenting to suit in federal court. Nor does Virginia's prior intervention in this case for the limited purpose of moving to dismiss Relator's VFATA claim (ECF 27) constitute a waiver. "To waive or forfeit a personal jurisdiction defense, a defendant must give a plaintiff a reasonable expectation that it will defend the suit on the merits or must cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking." *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010). When the states intervened and moved to dismiss Relator's state-law Medicaid fraud claims, Relator had not yet asserted any claim to a share of the Walgreens settlement, so the states' intervention cannot be deemed an indication of any intent to "defend…on the merits" a claim that had not yet been made. Mere "preliminary actions do not come close to what is required for waiver or forfeiture." *Id.* Virginia's Eleventh Amendment immunity thus remains intact and bars any claim by Relator for declaratory relief in this Court.

### D. VFATA's Alternate Remedy Provision Affords Relator No Relief

#### 1. Relator did not contribute to the Walgreens settlement and public disclosure bars his demand for a relator's share

The incorporated discussions in the Joint Opposition of North Carolina and Tennessee (ECF 182 at 1-6, 13-15) and its accompanying declarations and exhibits set forth the relevant background and history of the Walgreens settlement. The settlement is the product of years of work and negotiations undertaken by a group of state Attorneys General that began well before Relator filed his *qui tam* action. The misconduct by Walgreens that led to the settlement was

---

[11] *See also Mueller v. Thompson*, 133 F.3d 1063, 1064 (7th Cir. 1998) ("[I]mplicit waivers won't do; the court must be highly confident that the state really did intend to allow itself to be sued in federal court.").

12

already known by the time Relator filed his *qui tam* action, having been brought to light through a combination of enforcement actions, civil litigation by hundreds of local governments and the Attorneys General of at least two states, opioid prescription data that the Drug Enforcement Administration ("DEA") had made available to the states, and media reports. Relator's *qui tam* action contributed in no meaningful way to the settlement—and given that his action only alleged fraudulent acts in at most one state (Illinois), it did not contribute *at all* to Virginia's claims against Walgreens or its participation in the Walgreens settlement.

To claim a share of recovery, a relator must have provided information that the state relied on. *See, e.g.*, *United States ex rel. Kuriyan v. HCSC Ins. Servs. Co.*, No. CIV 16-1148 JB/KK, 2022 U.S. Dist. LEXIS 41502, at *9-10 (D.N.M. Mar. 9, 2022) (holding that a relator must "demonstrate that he brought information to [the state's] attention upon which [the state] subsequently relied to recoup funds from the [defendants]" and "that [the state] relied on [the relator's] actions or information when recouping overpayments"). Like the federal FCA, VFATA requires dismissal of a claim if "substantially the same allegations or transactions as alleged in the action or claim" were publicly disclosed. Va. Code § 8.01-216.8; *cf.* 31 U.S.C. § 3730(e)(4).

The information in Relator's *qui tam* action was not the basis, nor was it relied upon, for either the Walgreens settlement generally or Virginia's claims and participation in that settlement. Relator identified no allegedly fraudulent transactions outside of Illinois and made only the barest conclusory allegation that fraudulent practices were prevalent "throughout the United States." ECF 21, Sec. Am. Cplt., ¶ 38. By the time Relator filed his *qui tam* action, Walgreens' problematic dispensing practices and lack of internal controls were already well known, as they were the subject of hundreds of lawsuits and enforcement actions by local, state, and federal authorities, and numerous media reports. The public disclosure bar and the lack of any reliance by the states,

13

including Virginia, on Relator's *qui tam* action preclude any recovery of a relator's share.

## 2. The Walgreens Settlement is not an Alternate Remedy to Relator's *Qui Tam* Suit

Relator's fraud claims differ significantly from Virginia's consumer protection and nuisance claims, and the relief sought in Relator's *qui tam* action is very different from the relief obtained in the Walgreens settlement. Relator sought to stand in the states' shoes and seek reimbursement for Medicaid disbursements that were allegedly obtained by fraud, while the states (including Virginia) sought—and the settlement provides—relief for **prospective** opioid abatement and remediation.[12] Even if there were some factual overlap between Relator's *qui tam* action and Virginia's claims, Relator is not entitled to a share of Virginia's settlement recovery.

Discussing the federal FCA's alternate remedy provision, the court in *United States ex rel. Kennedy v. Novo A/S*, 5 F.4th 47 (D.C. Cir. 2021), held "the alternative remedial proceedings from which a relator can recover a share must redress the same type of falsity and fraud claims that otherwise could be pursued by a private relator's *qui tam* lawsuit under the False Claims Act." *Id.* at 56. The court further stated:

> if the alternate proceeding seeks recompense for some other type of claim that the relator could not have brought, then the proceeding is not covered by [the alternate remedy provision] because it is not 'alternate' to the [FCA] *qui tam* remedy. It is a different legal claim altogether, rising beyond the [FCA's] borders.

*Id.*

The claims redressed by the Walgreens settlement are not for "the same type of falsity and fraud" that could otherwise be pursued in a *qui tam* lawsuit, nor does the settlement provide the type of relief that could be obtained in such an action. Virginia's claims are consumer protection and nuisance claims brought on the public's behalf to redress public harms by seeking relief to

---

[12] These differences are further discussed in the State of Maryland's Opposition to Relator's Motion. ECF 145 at 7-10. Virginia adopts and incorporates by reference this discussion.

benefit the public. *See* Ex. B, Complaint, ¶¶ 1, 29-45. The Walgreens settlement and the Virginia authorities that dictate the allocation and use of settlement funds are structured to achieve this result. This is precisely a "type of claim that the relator could not have brought."

In *Novo A/S*, the relator brought a *qui tam* action against a drugmaker alleging Medicare and Medicaid fraud arising from the defendant's alleged marketing of a diabetes drug for unapproved uses. The United States intervened and settled the FCA case, and the relator was awarded a relator's share of that settlement. The United States also filed and settled a separate misbranding action against the drugmaker under the Food, Drug, and Cosmetic Act ("FDCA"). The relator sought a share of that settlement as well, but was denied.

In upholding the denial, the appellate court held that a false claims statute:

> does not reward relators any time the government pursues any 'alternate claim or cause of action' arising from the same facts and circumstances....[I]t is the nature of the legal claim—the fraudulent or false deprivation of a monetary or property interest—and not the commonality of facts that determines a relator's right to share in an alternate recovery.

*Id.* at 57. The existence of factual overlap between the relator's *qui tam* action and the government's FDCA case did not entitle the relator to a share of the government's recovery. *Id.* at 57-58 ("Factual symmetry alone is not enough to seal that deal."). Because the government's FDCA misbranding claim was not a type of claim the relator could have pursued in a *qui tam* action, the relator was not entitled to a share.

Similarly, given the differences between Relator's *qui tam* claims and the state claims redressed by the Walgreens settlement—and the differences between the relief sought in Relator's *qui tam* action and obtained in the Walgreens settlement—a relator's share is not available.

### III. CONCLUSION

For the foregoing reasons, the Court should deny Relator's Motion.

15

Dated: February 3, 2026                    Respectfully submitted,

                                                                       COMMONWEALTH OF VIRGINIA

                                                                       JAY JONES
                                                                       Attorney General of Virginia

                                         By:     /s/     Thomas M. Beshere, III
                                                      Thomas M. Beshere, III (VSB No. 41279)
                                                      (Admitted *pro hac vice*)
                                                      Senior Assistant Attorney General
                                                      Office of the Attorney General of Virginia
                                                      202 North 9th Street
                                                      Richmond, Virginia  23219
                                                      (804) 823-6335
                                                      tbeshere@oag.state.va.us

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on February 3, 2026, he caused a true and correct copy of the **COMMONWEALTH OF VIRGINIA'S OPPOSITION TO PLAINTIFF-RELATOR'S MOTION FOR A DECLARATORY JUDGMENT THAT RELATOR IS ENTITLED TO A SHARE OF THE STATES' SETTLEMENT WITH WALGREENS** to be served via the Court's ECF/electronic mailing system upon all counsel of record.

/s/     Thomas M. Beshere, III